632 F.2d 1068
 EASTERN ASSOCIATED COAL CORP., Appellant in No. 79-2397,
v.
AETNA CASUALTY & SURETY COMPANY; American Home Assurance
Company; Highlands Insurance Company; Home Insurance
Company; First State Insurance Company; Leonard Ronald
Hayward and all other Underwriters at Lloyds subscribing to
policy # 2080712; Excess Insurance Company, Ltd.; Indemnity
Guarantee Assurance Ltd.; London & Edinburgh Insurance
Company, Ltd.; Yasuda Fire & Marine Insurance Ltd.; Nichido
Fire & Marine Insurance Co. Ltd.; Turegum Insurance Co.,
Ltd.; and Baloise Insurance Co., Appellants in No. 79-2398.
 Nos. 79-2397, 79-2398.
 United States Court of Appeals,
Third Circuit.
 Argued May 19, 1980.
Decided Sept. 23, 1980.
 
 Raymond G. Hasley (argued), Brian W. Ashbaugh, Rose, Schmidt, Dixon, Hasley, Whyte & Hardesty, Pittsburgh, Pa., for appellant in No. 79-2397 and cross-appellee in No. 79-2398.
 Stuart Cotton (argued), John Mezzacappa, Rein, Mound & Cotton, New York City, and Samuel P. Gerace, Jones, Gregg, Creehan & Gerace, Pittsburgh, Pa., for appellees in No. 79-2397 and cross-appellants in No. 79-2398.
 Before ADAMS, VAN DUSEN and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Senior Circuit Judge.
 
 
 1
 This diversity case involves cross-appeals from a partial grant of the defendants' motion for judgment notwithstanding the verdict. The jury awarded Eastern Associated Coal Corporation (Eastern) $4,736,377. under a business interruption insurance policy held with the defendant insurers for losses incurred due to the closing of Eastern's Joanne Mine after an underground fire. The defendants moved for judgment n. o. v. on two grounds. First, the defendants' motion argued that there was insufficient evidence to support the plaintiff's theory concerning the sales value of a portion of the coal which would have been mined by Eastern during the interruption covered by the policy. The trial judged granted this portion of the motion and reduced the jury's award by $890,744. Eastern appeals from this action. Second, the defendants' motion argued that the insurance policy did not cover any expenses incurred by Eastern in obtaining alternative coal to fulfill its contractual obligation to supply metallurgical coal from the Joanne Mine to Sharon Steel Corporation. The trial court, 475 F.Supp. 586, denied this portion of the motion and entered judgment for $3,845,633. We affirm the trial court's grant of judgment n. o. v. with regard to the first portion of the motion and reverse the trial court's denial of judgment n. o. v. with regard to the second portion of the motion. The case will be remanded for entry of judgment against the defendant insurers in the amount of $287,277.
 
 I.
 
 2
 Eastern, a West Virginia corporation with offices in Pittsburgh, Pennsylvania, operates a number of underground soft coal mines in Pennsylvania and West Virginia. In 1969, Eastern purchased the Joanne Mine, located near Rachel, West Virginia, from Sharon Steel Corporation. Some of the coal in the mine was metallurgical coal; the balance was classified as steam coal. Sulphur content is the distinguishing factor between the classifications. Metallurgical coal has a low sulphur content, and accordingly burns at high temperatures. It is required in the production of steel. Steam coal has a higher sulphur content, burns at lower temperatures, and is not suited to use in steel production. The purchase agreement with Sharon provided in part for a coal supply contract, under which Eastern agreed to furnish the metallurgical coal requirements of Sharon's Fairmont Coke Works, estimated at 250,000 tons annually, for a ten-year period. The contract contained base prices for coal and an escalator clause to cover increases in the cost of production. It also provided that the coal supplied would come from the Joanne Mine until its metallurgical coal reserves were exhausted. As the seam was estimated to contain 1,125,000 tons of metallurgical coal, the Joanne Mine was expected to supply Sharon for approximately four and one-half years. After exhaustion of the Joanne metallurgical area, Eastern was obligated under the contract to obtain metallurgical coal from other sources for the remainder of the term of the contract. The contract also contained a provision which required all metallurgical coal to have a sulphur content of less than 1.6%.[1] Sharon could reject any coal which did not comply with this specification.
 
 
 3
 In 1972 Eastern bought the business interruption insurance policy under which it is currently suing. The policy was part of a four-policy package which covered all of Eastern's mines in Pennsylvania and West Virginia for business interruption insurance. Eastern's protection under the total package was $20,000,000. Each layer insured $5,000,000. The first policy covered losses up to $5,000,000. sustained from the closing of any mine. The second policy covered losses from $5,000,000. to $10,000,000., the third up to $15,000,000., and the fourth up to $20,000,000. These policies were produced by Eastern's insurance broker, Marsh & McLennan, Inc., which selected the form, prepared the policies, and sent the policies to the insurers and underwriters for signature. Several insurers helped to underwrite each policy.
 
 
 4
 On January 14, 1974, a fire broke out as the result of an underground accident involving the derailment of a mine locomotive in the metallurgical section of the Joanne Mine. Within 24 hours the mine was totally sealed as a means of extinguishing the fire by depriving it of oxygen. This fire, however, terminated all mining operations for a 12-month period, which was the term of coverage under the policy.
 
 
 5
 During the year after the closing, Eastern's coal production at the mine was essentially zero. However, it was estimated that Eastern could have mined approximately 181,000 tons of metallurgical coal and 434,000 tons of steam coal during the year of coverage, if there had been no interruption. In determining recovery under the policy, the value of this lost production to Eastern is an important factor. The recovery increases directly in proportion to the value of lost production.
 
 
 6
 There is no dispute concerning the value of the lost steam coal production. There is a dispute, however, concerning the value of the lost metallurgical coal production. The parties agreed at trial that value was to be determined by the contract price for coal which would be sold under contract and by market price for coal which would be sold on the open market. The dispute here concerns how much coal would be sold on the market. The insurers believe that all of the metallurgical coal would have been sold to Sharon under the contract. If this is the case, it is agreed that the total recovery under the policies for lost production would be $5,287,277.[2] Eastern, however, asserts that 77,000 of the 181,000 tons of lost metallurgical coal production would have been rejected by Sharon because they would have had a sulphur content in excess of the 1.6% requirement of the contract. Eastern, accordingly, asserts that the 77,000 tons would have been sold on the open market and should be valued at the higher market price. The increased revenues which would have been obtained from selling such coal on the open market are claimed to be $890,744.[3] Accordingly, Eastern asserts that its recovery should be at least $6,178,021.-the total of $5,287,277. plus $890,744. The insurers dispute recovery of the additional $890,744. This is the first issue we must resolve.
 
 
 7
 Eastern makes an additional claim under the policy. Eastern claims that the policy covered the expenses Eastern incurred in obtaining alternative coal to fulfill its contractual obligation to supply metallurgical coal from the Joanne Mine to Sharon Steel. After the fire, Eastern contended that due to a force majeure clause in its contract with Sharon, it was relieved of its obligation to supply Sharon with metallurgical coal. Sharon disagreed, and the dispute was brought to arbitration. The arbiter held that Eastern's obligation to Sharon continued despite the fire, and Eastern was accordingly forced to continue supplying Sharon with metallurgical coal.
 
 
 8
 This arbitration award exposed Eastern to a substantial new expense. Due to the oil embargo in 1973, the price of coal began to rise steadily. However, during the year of interruption the escalator clause in the contract with Sharon did not keep pace with the increase in market price. Under the contract with Sharon, Eastern was being paid $13.00 to $18.00 a ton for metallurgical coal, while the market price ranged from $50.00 to $75.00. During the interruption, Eastern obtained much of the coal for Sharon from its other mines. Such coal has been denominated "substitute coal." In selling the substitute coal to Sharon, Eastern was deprived of the profit it could have made by selling such coal on the market. Eastern calculated its loss during the year on substitute coal to be $1,599,461. Eastern met the remaining requirements under the Sharon contract by buying coal on the open market and reselling it to Sharon at the lower contract price. Coal bought on the market has been denominated "brokerage coal," and Eastern calculated its loss on brokerage coal to be $2,175,240. Totaled, Eastern determined its loss on its contract with Sharon to be $3,774,701, thus bringing the full liability claimed against the insurers to $9,952,722.[4] The insurers disputed Eastern's right to recover any money for the expense incurred in complying with Sharon's contract. This presents the second issue we must resolve.
 
 
 9
 In this case the insurers conceded recovery of $5,287,277. The first layer insurers made full payment under their policy. Therefore, the present suit concerns only the amount in excess of $5,000,000, which is $4,952,722. It is brought solely against the second layer of insurers, who have made no payments to date.
 
 
 10
 The trial judge denied the defendant insurers' motions for summary judgment and a directed verdict and submitted both issues to a jury. The jury returned a verdict against the insurers in the amount of $4,736,377, which is $216,345 less than the total demanded by Eastern. Post-trial motions for judgment n. o. v. were filed by the insurers. The trial judge granted judgment n. o. v. against Eastern on the first issue. He found the evidence supporting this claim to be speculative[5] and reduced the recovery by $890,744.[6] The judge denied the motion on the second issue and entered judgment against the defendant insurers for $3,845,633. The parties appeal from the grant and denial of judgment n. o. v., respectively.II.
 
 
 11
 Eastern's appeal is from the trial judge's grant of judgment n. o. v. in the amount of $890,744. In reviewing the district court's order, we are guided by the substantive law of Pennsylvania.[7] Eastern attempted to show that 77,000 tons of metallurgical coal would have been rejected by Sharon and sold on the open market due to its high sulphur content. To this end, Eastern demonstrated that Sharon had the right to reject coal delivered with a sulphur content exceeding 1.6%, and that Sharon had in fact exercised that right on at least one occasion prior to the fire. Eastern also presented a letter from Sharon Steel Corporation authorizing Eastern to sell any rejected coal on the open market. Eastern, further, submitted evidence of the sulphur content of the coal remaining in the metallurgical portion of the mine at the time of the fire. This data had been obtained by analyzing bore samples of coal from the metallurgical section of the mine. Plaintiff argued that this data showed that approximately 77,000 tons of metallurgical coal in the mine had a sulphur content ranging from 1.6% to 2.0%.
 
 
 12
 The insurers do not challenge these facts. However, they assert that proof of the sulphur content of the coal in the mine is insufficient to prove the sulphur content of the coal at the time of delivery. They note that after removal from the mine and before delivery, the coal is "washed." This washing process reduces the sulphur content of the coal. Under questioning at trial, a representative of Eastern explained the process as follows:
 
 
 13
 "Q. By the way, do you know anything about washing coal? Do you know what it is, what it means?
 
 
 14
 "A. It's the process of taking coal as it comes from the ground, putting it through equipment from which ash and sulphur are removed.
 
 
 15
 "Q. Washing removes sulphur?
 
 
 16
 "A. Yes.
 
 
 17
 "Q. Is coal washed when it comes out of the ground at Joanne or is it just taken out of the ground and shipped off?
 
 
 18
 "A. No, it's washed.
 
 
 19
 "Q. It was washed?
 
 
 20
 "A. Yes.
 
 
 21
 "Q. To remove ash and sulphur?
 
 
 22
 "A. Yes."[8]
 
 
 23
 A representative of Sharon Steel Corporation, called by the insurers, testified to the same effect:
 
 
 24
 "Q. ... Now we're talking about the Joanne Mine and the met section. Between the time that the coal comes out of the mine and it gets to Sharon, is the coal under the contract supposed to be cleaned?
 
 
 25
 "A. I don't recall if it specifically says washed. I know all the coal-
 
 
 26
 "Q. I used the wrong expression. Washed.
 
 
 27
 "A. It does not specifically call(,) what I can read here(,) that it must be washed.
 
 
 28
 "Q. Was it washed?
 
 
 29
 "A. To my knowledge, it was washed, yes.
 
 
 30
 "Q. Do you know what washing does to coal?
 
 
 31
 "A. Generally it reduces the ash and sulphur."[9]
 
 
 32
 Eastern does not challenge the accuracy of these statements. As it is uncontested that the sulphur content of the coal was altered between mining and shipping, we hold that the evidence of the sulphur content of coal in the mine alone was insufficient for the jury to determine the sulphur content at the time of delivery. Without evidence of the effectiveness of the washing process, the jury could only speculate concerning the sulphur content at the time of delivery. There is no evidence from which the jury could infer the effectiveness of washing.[10] It was Eastern's burden to provide evidence from which its claim can be established. Pennsylvania Co. for Ins. on Lives v. Central Trust & Savings Co., 255 Pa. 322, 99 A. 910 (1917); Mackiw v. Pennsylvania Threshermen & Farmers' Mut. Cas. Ins. Co., 201 Pa.Super. 626, 638-39, 193 A.2d 745, 751 (1963).[11] As Eastern has not done so, it has failed in its proof on this issue.
 
 
 33
 This failure of proof is grounds for granting a judgment n. o. v. In considering a motion for judgment n. o. v., the court must view the evidence in the light most favorable to the party who secured the jury verdict. Firemen's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1178 (3d Cir. 1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977); 5A Moore's Federal Practice P 5.07(2). However, a jury verdict may not stand if it is based on mere speculation. Eastman Kodak Co. v. Southern Photo Materials Co., 273 U.S. 359, 47 S.Ct. 400, 71 L.Ed. 684 (1927); Columbia Metal Culvert Co. v. Kaiser Alum. & Chem. Corp., 579 F.2d 20, 25 (3d Cir.), cert. denied, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978); Morris Bros. Lumber Co. v. Eakin, 262 F.2d 259, 263 (3d Cir. 1950). Since the jury in this case could only speculate as to the effect of washing and the amount of coal that would have a sulphur content exceeding 1.6% at the time of delivery, it could only speculate as to how much coal would have been rejected by Sharon and been sold on the open market. The jury may not be permitted to do this. Accordingly, we will affirm the district court's grant of judgment n. o. v. on this issue. This limits Eastern to a recovery under the policy calculated on the value of its lost production of metallurgical coal measured by the contract price of such coal.
 
 III.
 
 34
 The insurers appeal from the district court's entry of judgment on the second issue. They argue that the insurance policy is unambiguous and makes no provision for recovery of new expenses which an insured may incur due to an interruption. Accordingly, they argue that as a matter of law Eastern's loss incurred in selling substitute and brokerage coal to Sharon under the contract is not insured under the policy. Eastern, however, argues that the policy is ambiguous, and that the language should be construed to afford recovery. Eastern contends that recovery is assured under two separate provisions in the policy. The district court charged the jury in accordance with Eastern's theories. To determine whether this was error, we must analyze the policy.
 
 
 35
 The rules relating to the analysis of insurance policies in Pennsylvania are well established. Since the policy is a contract, the court's duty is to ascertain the intent of the parties as manifested in the language of the agreement. Mohn v. American Cas. Co. of Reading, 458 Pa. 576, 326 A.2d 346 (1974); Lovering v. Erie Indem. Co., 412 Pa. 551, 195 A.2d 365 (1963); Treasure Craft Jewelers, Inc. v. Jefferson Ins. Co., 583 F.2d 650, 652 (3d Cir. 1978). The court should read policy provisions so as to avoid ambiguities, if the plain language of the contract permits. Pennsylvania Manufacturers' Association Ins. Co. v. Aetna Casualty & Sur. Ins. Co., 426 Pa. 453, 457, 233 A.2d 548, 551 (1967); Kattelman v. National Union Fire Ins. Co., 415 Pa. 61, 64, 202 A.2d 66, 67 (1964). A court should not torture the language of the policy in order to create ambiguities. Urian v. Scranton Life Ins. Co., 310 Pa. 144, 165 A. 21 (1933). If the language is unambiguous, interpretation of the contract is a matter of law for the court. Adelman v. State Farm Mut. Auto. Ins. Co., 255 Pa.Super. 116, 123, 386 A.2d 535, 538 (1978); Blocker v. Aetna Cas. & Sur. Co., 232 Pa.Super. 111, 114, 332 A.2d 476, 477-78 (1975). If an ambiguity does exist and if the insurer wrote the policy or is in a stronger bargaining position than the insured, the ambiguity is generally resolved in favor of the insured and against the insurer. Mohn v. American Cas. Co. of Reading, supra; Lovering v. Erie Indem. Co., supra at 556, 195 A.2d at 368; Hionis v. Northern Mut. Insurance Co., 230 Pa.Super. 511, 516, 327 A.2d 363, 365 (1974). However, the principle that ambiguities in policies should be strictly construed against the insurer does not control the situation where large corporations, advised by counsel and having equal bargaining power, are the parties to a negotiated policy. Eastcoast Equipment Co. v. Maryland Cas. Co., 38 Pa.D.&C.2d 499, 511-12, 218 A.2d 91, 98 (Pa.C.P.1965), aff'd per curiam on opinion below, 207 Pa.Super. 383, 218 A.2d 91 (1966); 13 Appleman, Insurance Law and Practice § 7402, at 301 (1976).
 
 
 36
 As pointed out at page 1071 above, Eastern's insurance broker selected the policy forms, prepared the policies, and sent them to the insurance companies for execution. Under these circumstances, the Pennsylvania cases indicate that conflicts over the interpretation of an insurance contract should be resolved against the party preparing the contract. See Sykes v. Nationwide Mutual Insurance Co., 413 Pa. 640, 643, 198 A.2d 844, 845 (1964) ("where ambiguity clouds interpretation the contract in controversy must be interpreted against its authors"); Cadwallader v. New Amsterdam Cas. Co., 396 Pa. 582, 586, 152 A.2d 484, 487 (1959) ("if there be any ambiguity in the contract of insurance it must be resolved in favor of the insured since it was the insurer who wrote the contract " (emphasis added)). At a minimum, the above cited cases require that we not construe the language against the defendants.
 
 
 37
 These legal principles are fully applicable to the interpretation of business interruption insurance policies in Pennsylvania. Cleland Simpson Co. v. Fireman's Ins. Co. of Newark, 11 Pa.D.&C.2d 607, 612-13, 140 A.2d 41, 44 (Pa.C.P.1957), aff'd per curiam on opinion below, 392 Pa. 67, 140 A.2d 41 (1958); Nusbaum v. Hartford Fire Ins. Co., 276 Pa. 526, 120 A. 481 (1923).[12]
 
 
 38
 With these legal principles in mind, we turn to the language of the policy in controversy. The policy sets out a general statement of its coverage and then addresses the determination of the value of the loss insured. It reads as follows:
 
 
 39
 "3. COVERING ON:
 
 
 40
 (B) This policy also insures against loss of earnings (as defined herein) resulting from damage to, or destruction of any of the property of the Assured occurring during the term of this policy.
 
 
 41
 "10. VALUATION:
 
 
 42
 b. Business Interruption-Recovery in the event of loss hereunder shall be the ACTUAL LOSS SUSTAINED by the Assured directly resulting from such interruption of business, but not exceeding the reduction in earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such part of the property herein described as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll, expense, to the extent necessary to resume operations of the Assured with the same quality of service which existed immediately preceding the loss.
 
 
 43
 "EARNINGS DEFINED: For the purpose of this insurance "Earnings" are defined as ...:
 
 
 44
 "(a) Total net sales value of production,[13]
 
 
 45
 ... In determining "Earnings" due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.
 
 
 46
 "EXPENSES INCURRED TO REDUCE LOSS: Any and all expense incurred by the Assured to reduce loss hereunder is covered by this insurance to the extent only of the loss which would have been sustained had such expense not been incurred."
 
 A.
 
 47
 As noted above, the insurers argue that this policy is unambiguous and makes no provision for recovery of new expenses. Eastern disagrees and contends, first, that the language in paragraph 10-b defining recovery is ambiguous and hence the rule of construction that ambiguous language should be interpreted against the insurer and in favor of coverage should be applied. See cases cited above at the top of page 1075. We agree with the insurers and find this language unambiguous. For this reason, the rule that contracts are construed strictly against the insurer cannot apply. Penn-Air, Inc. v. Indemnity Ins. Co. of N. A., 439 Pa. 511, 517, 269 A.2d 19, 22 (1970); Patton v. Patton, 413 Pa. 566, 573, 198 A.2d 578, 582 (1964); Miller v. Prudential Ins., 239 Pa.Super. 467, 472, 362 A.2d 1017, 1020 (1976). As will be explained below, the language of paragraph 10-b itself is an adequate guide to interpretation. Two other courts of appeals have arrived at the same conclusion when interpreting business interruption policies using similar language. Rogers v. American Ins. Co., 338 F.2d 240, 242 (8th Cir. 1964); American Alliance Ins. Co. v. Keleket X-Ray Corp., 248 F.2d 920, 928 (6th Cir. 1957) (holding that the policy is unambiguous and that "the loss must be determined strictly in accordance with the terms of the insurance policies ..."). Accordingly, we need not resort to rules of construction.
 
 
 48
 Paragraph 10-b sets forth a formula precisely limiting the scope of recovery. The policy states that the business interruption loss shall not exceed "the reduction in earnings less charges and expenses which do not necessarily continue during the interruption." A close analysis of the terms of this formula demonstrates that it is subject to only one reasonable interpretation.
 
 
 49
 The first element of the formula is "the reduction in earnings." To understand this element, the term "earnings" must first be understood. On the facts of this case, earnings are the "total net sales value of production." This phrase refers to the value of the coal which Eastern would have mined during the period of interruption, if operations had continued.[14] In light of this definition of "earnings," the phrase "the reduction in earnings" can only refer to the difference between expected earnings and actual earnings-in mathematical language, the expected value of production if no interruption had occurred minus the actual value of production from mining operations. As the mine was totally closed after the fire, the actual value of production in this case was zero. Accordingly, "the reduction in earnings" in this case equals the value of lost production.
 
 
 50
 The second element of the formula is the phrase "charges and expenses which do not necessarily continue during the interruption." This language refers to expenses that the insured business incurs during normal operations which, because of the work stoppage, it does not need to incur during the interruption, such as fuel to run machinery in the mine.[15] Thus, the second element of the formula refers to expenses which could properly be discontinued during the interruption.
 
 
 51
 The formula directs that the recovery may not exceed the first element less the second element. Thus, in fuller terms, the formula provides that discontinued expenses be subtracted from the value of lost production. Recovery may not exceed the resulting figure. Eastern's initial claim filed with the insurers followed this formula precisely,[16] demonstrating that this provision of the policy was understood by both parties to the contract. This fact further buttresses our conclusion that the language is not ambiguous and that its terms should be strictly followed.
 
 
 52
 From this review of the formula used to calculate recovery under the policy, we believe it is apparent that the policy makes no provision for recovery of an expense which is newly created by the interruption, such as Eastern's substitute and brokerage coal cost. The policy merely insures that the interrupted business will receive the amount of money which continued operation would have produced reduced by the amount of any routine costs which the business avoided by closing. If new expenses are produced by the interruption, the formula under paragraph 10-b makes no allowance for their recovery.
 
 
 53
 Despite the failure of the language of paragraph 10-b to insure against new expenses, Eastern argues that coverage for new expenses must be provided on the basis that business interruption insurance should protect insureds from all loss due to business interruptions. Eastern bases this assertion on the generally accepted statement that business interruption insurance "is designed to do for the insured in the event of business interruption caused by fire, just what the business itself would have done if no interruption had occurred ..." National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp., 141 F.2d 443 (10th Cir. 1944). Eastern extrapolates from this general statement that the recovery must leave the insured in the same financial position it would have been in at the end of the policy's term had no interruption taken place. Eastern argues that, because it is in a worse financial position after the interruption, due to the new expenses, than it would have been in if no interruption had occurred, new expenses must be covered.
 
 
 54
 Eastern's argument based on this general statement fails because the policy makes no provision for recovery of new expenses and because the clear language of the policy limits recovery to the amount derived from the formula discussed above. If new expenses are to be compensated, the express language limiting recovery would have to be ignored. Since there is no ambiguity, there is no basis for ignoring this language.
 
 
 55
 Moreover, there is no support in the case law for Eastern's argument. National Union Fire Ins. Co. v. Anderson-Prichard Oil Corp., supra, and the many other cases citing the general statement concerning business interruption insurance quoted above do not address the problem of whether to award recovery for new expenses produced by an interruption. They simply note in situations where new expenses have not been incurred, that the recovery under a business interruption insurance policy is likely to return the insured to the financial status it would have been in if no interruption had occurred. In situations where no new expenses are incurred, this statement is correct. In light of the lack of ambiguity in the policy, the absence of any provision compensating new expenses in paragraph 10-b's formula, and Eastern's failure to uncover any cases in which recovery for new expenses was obtained under a business interruption policy,[17] we hold that new expenses produced by the interruption are not covered by the formula for recovery provided in paragraph 10-b of this policy. In charging the jury in accordance with Eastern's theory of paragraph 10-b, the district court erred.
 
 B.
 
 56
 The district judge also charged the jury with a second theory of recovery for the substitute and brokerage coal expense under the policy. The court charged that these additional expenses could be compensated under the "Expenses Incurred to Reduce Loss" provision of paragraph 10-b of the policy. This charge was also incorrect.
 
 
 57
 The provision provides as follows:"EXPENSES INCURRED TO REDUCE LOSS: Any and all expense incurred by the Assured to reduce loss hereunder is covered by this insurance to the extent only of the loss which would have been sustained had such expense not been incurred."
 
 
 58
 Here, again, the words of the policy are not sufficiently ambiguous to necessitate the application of rules of construction. See American Alliance Ins. Co. v. Keleket X-Ray Corp., 248 F.2d 920, 930 (6th Cir. 1957). As noted above at page 1076, Pennsylvania cases hold that a clause must be ambiguous before a court applies rules of construction.
 
 
 59
 Eastern argues that its substitute and brokerage coal expense was "incurred by the Assured to reduce loss" caused by the interruption and, therefore, is covered by the policy. We do not doubt that Eastern's liability to Sharon was reduced by its resort to substitute and brokerage coal. However, Eastern fails to take account of the exact words of the policy. The provision compensates insureds for expenses incurred "to reduce loss hereunder" (emphasis added). We believe the phrase "loss hereunder" plainly refers to loss compensated under the policy.[18] As was established above in discussing the formula for recovery under paragraph 10-b, the new brokerage and substitute coal expenses resulting from the interruption are not losses compensated under this policy. Accordingly, such new expenses cannot serve to "reduce loss hereunder."
 
 
 60
 Our interpretation is consistent with the clear intent of the "Expenses Incurred to Reduce Loss" provision. The provision is designed to encourage insureds to undertake new expenses which will result in an overall reduction of the insurer's liability. Support for our interpretation can be found in the Sixth Circuit's case of American Alliance Ins. Co. v. Keleket X-Ray Corp., supra. In Keleket the district court had awarded recovery under a provision of a business interruption insurance policy substantially similar to the one at bar[19] for expenses incurred in decontaminating a building which had been contaminated by radioactive material in a small explosion inside the building. The court reversed the district court's award under the provision, and explained that:
 
 
 61
 "(T)he insured (has not) introduced any evidence of expenses necessarily incurred to reduce the business interruption losses. Had the plaintiff shown that the period of interruption had been shortened by use of overtime labor at premium wages, for example, then the premium wages would be allowable up to the amount by which the liabilities of the insurers under the business interruption policies had been reduced. The record is devoid of evidence to this effect. In the absence of evidence showing that the expenditures had actually reduced the business interruption losses, the district court was in error in allowing any decontamination expense as an expense incurred to reduce the loss under the business interruption policies."
 
 
 62
 Id. at 930-31 (emphasis added).
 
 
 63
 As the brokerage and substitute coal expense in no way served to reduce the insurer's liability under the policy, it cannot be compensated under the "Expenses Incurred to Reduce Loss" provision. Eastern's interpretation, which renders the word "hereunder" meaningless, is plainly at odds with the unambiguous meaning of the provision.
 
 
 64
 Our review of the pertinent case law and the language of this policy convinces us that Eastern is not entitled to recover new expenses produced by the closing of the Joanne Mine. Accordingly, the insurer's motion for judgment n. o. v. should have been granted.
 
 IV.
 
 65
 In conclusion, we hold that the district court did not err in entering judgment n. o. v. against Eastern based on the speculative nature of the evidence concerning the high sulphur content of some of the coal to be delivered to Sharon Steel Corporation. We further hold that the district court erred in denying the motion for judgment n. o. v. against Eastern with respect to the brokerage and substitute coal expenses. Accordingly, the case will be affirmed in part, reversed in part, and remanded to the district court for entry of judgment against the insurers for $287,277, the amount conceded to be owed by defendants.
 
 
 
 [1]
 The sulphur content requirement was actually somewhat more stringent and complicated. However, for simplicity Eastern conceded at trial that only coal exceeding 1.6% sulphur content would be deemed to be non-complying, and that all coal having 1.6% sulphur content or less would be deemed to comply. Revised Brief for Plaintiff-Appellant at 19
 
 
 [2]
 The district court found that the defendant insurers admitted liability in the amount of $287,277. in its brief filed in support of its motion for judgment notwithstanding the verdict (160a). The insurers have pointed to no written documentation controverting such admission at the post-trial stage of the district court proceedings
 
 
 [3]
 $890,744. does not represent the market price of 77,000 tons of metallurgical coal. It represents the amount by which the market price exceeds the contract price of the 77,000 tons
 
 
 [4]
 Eastern arrived at this figure by adding $3,774,701. to the $6,178,021. claimed under the first issue outlined in the text
 
 
 [5]
 168a
 
 
 [6]
 As the jury verdict was $216,345. less than the amount demanded by Eastern, it is not clear that the jury awarded Eastern all $890,744. demanded on its first claim. It is clear, however, that the jury awarded at least $674,399. on this claim
 
 
 [7]
 The district court applied the substantive law of Pennsylvania in this case. Because the parties do not contest the choice of Pennsylvania law, and because Pennsylvania has both substantial interest in and close contact with the transactions at issue, we have no occasion to address the district court's decision in this regard. Accordingly, our consideration of the substantive questions presented by these appeals will be guided by the law of Pennsylvania. Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp., 626 F.2d 280, (3d Cir., 1980); Steaks Unlimited v. Deaner, 623 F.2d 264, 275 (3d Cir. 1980); Pierce v. Capital Communications, Inc., 576 F.2d 495, 502 n. 19 (3d Cir.), cert. denied, 439 U.S. 861, 99 S.Ct. 181, 58 L.Ed.2d 170 (1978)
 
 
 [8]
 362a
 
 
 [9]
 604a-605a. Paragraph 15 of Eastern's contract with Sharon provides that, "During the period from June 18, 1969, to exhaustion of Joanne metallurgical reserves, estimated to be 1,125,000 tons recoverage, cleaned coal basis-Seller will supply the high volatile requirements under this Agreement from its Joanne Mine." 745a (emphasis added)
 
 
 [10]
 We have examined the record on this issue with great care and with the assistance of Eastern's briefs and letter of May 24, 1980, prepared at the request of the court at argument. We note that Eastern's reply brief at 34 states that "there is no evidence to show how washing specifically effects (sic), if at all, the metallurgical coal from the Joanne mine." We believe that, with the exception of the phrase "if at all," this is an accurate statement and supports our conclusion that Eastern has failed to carry its burden on this issue
 However, Eastern elsewhere makes the argument that inferences can be drawn from the evidence at trial that washing is ineffective in reducing sulphur. None of these alleged inferences is supported by the record.
 First, Eastern's letter refers to plaintiff's exhibit 20 (765a-770a). Eastern implies that this exhibit demonstrates the difference in sulphur content of coal before and after washing. In fact, the exhibit merely shows the percentage of sulphur in washed coal, when it has 5% moisture in it, compared to the percentage of sulphur in the identical washed coal, when it has 0% moisture in it. Thus, exhibit 20 is silent with regard to the effectiveness of washing.
 Second, Eastern's reply brief, at 35, asserts that because washing is a "mechanical cleaning" process, it is ineffective in reducing sulphur which is measured by a "chemical analysis." There is no logic to this assertion. It is obvious that if a "mechanical cleaning" process reduces the sulphur content, the reduction will be reflected in a later "chemical analysis."
 Finally, Eastern argues that because a shipment of coal mined in early January 1974 had a sulphur content of 1.59% after washing, and other coal, which would have been mined at the end of January 1974, had an in-mine sulphur content of 1.64%, it can be inferred that washing is essentially ineffective. Again, Eastern's argument is based on speculation. We are asked to assume, without supporting evidence, that the coal which was washed had an in-mine sulphur content of 1.64%. We can make no such assumption because it was undisputed that the concentration of sulphur in the coal varied throughout the mine.
 
 
 [11]
 Pennsylvania law governs the parties' burden of proof in this case. Firemen's Fund Ins. Co. v. Videfreeze Corp., 540 F.2d 1171, 1174 (3d Cir. 1976), cert. denied, 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977)
 
 
 [12]
 The Nusbaum case returned to the Pennsylvania Supreme Court after trial on remand, Nusbaum v. Hartford Fire Ins. Co., 285 Pa. 332, 132 A. 177 (1926). In Nusbaum II the court found no error in the jury's determination of the cause of the insured's loss or calculation of the insured's damages. Eastern argues that Nusbaum II stands for the proposition that "it is for the jury to determine the measure of damages" (Reply Brief for Appellant-Cross-Appellee at 14). Indeed, Nusbaum II permits a jury to determine the value of each element in an insurance policy's formula for recovery. However, the formula for recovery is not a jury question, but a question of law for the judge to determine from the language of the policy
 Also, it is noted that it may well not have been possible to grant summary judgment for the insurer before trial because evidence offered at the trial might have disclosed an ambiguity. See Horowitz v. American Casualty Co. of Reading, Pa., --- Pa.Super. ---, 419 A.2d 660 (1980) (reversing summary judgment for insurer on issue whether business interruption policy excluded coverage because court "unable to say that (insured's) interpretation of the ... exclusion is clearly wrong"). The appellate court in Horowitz held that the trial judge improperly decided on summary judgment that the exclusion was unambiguous. It remanded since the ambiguity "upon appropriate testimony might be resolved" in the insured's favor, even though the policy was negotiated and not merely the insurer's form. The exclusion in Horowitz differed from the one we construe today. More important, Eastern had an opportunity at trial to produce evidence of an ambiguity, but failed to do so based on the record before us.
 
 
 [13]
 The formula for determining "earnings" provided in the policy includes several factors which have been deleted for simplicity, because their impact on the value of the earnings figure in this case is effectively zero
 
 
 [14]
 This conclusion is supported by paragraph 10-b's direction that "(i)n determining 'Earnings' due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred." This direction provides that earnings will be calculated by determining the receipts of the mining operation before the interruption and extrapolating future receipts from this figure in light of the business circumstances of the insured business during the period of interruption. In this case, the guidance means that one looks to prior experience for an estimate of the amount of coal which would have been mined, and then applies interruption period prices to that amount to determine the value of lost production
 
 
 [15]
 The word "necessarily" permits the insurance company to challenge the insured's decision to continue an expense. However, the policy's statement that:
 "Due consideration shall be given to the continuation of normal charges and expenses, including payroll, expense, to the extent necessary to resume operations of the Assured with the same quality of service which existed immediately preceding the loss."
 limits the insurer's right to assert that an expense, which was continued, was not necessary.
 
 
 [16]
 Plaintiff's initial claim was filed as follows:
 Cont. Expenses
 & Lost Net
 Profit
Calculation of Loss
Sales Value of Production of 615,659 tons $10,565,028
Less:
 Ordinary Payroll ............... $2,146,576
 Work Comp. & S.S................... 242,939
 Materials ....................... 1,047,544
 Power ............................. 189,500
 United M. W. Welfare .............. 517,510
 Royalty ............................ 49,253
 Taxes ............................. 369,776 4,563.098
 ---------- -----------
 Gross Earnings ............................ $ 6,001,930
General & Administrative Exp.
 Projected
Salaries & Foreman ............... $1,146,763 $ 904,687
Work. Comp. & S.S.................... 158,953 125,568
Town & Incidental .................... 28,842 7,398
Power (fixed) ....................... 123,874 123,874
Vacation & Holiday .................. 415,849 --
Insurance ............................ 41,548 41,548
Property Taxes ....................... 50,633 50,633
Pension & Insurance ................. 155,938 155,938
Other Inc. & Exp.-Mining ............. 17,753 17,753
Depreciation ........................ 523,137 523,137
Miscell. Inc. & Exp.-Adminis.......... 28,283 28,283
Pittsburgh Overhead ................. 193,845 193,845
Sales Expenses ...................... 169,636 169,636
Development & Depletion .............. 90,780 3,145,834 88,881
 ---------- ----------- ----------
 Projected Net Profit ....................... $2,856,096 2,856,096
 ----------- ----------
 Projected Net Profit & Cont. Expenses $5,287,277
*1081_ (Plaintiff's Exhibit 54, 784a.)
 This sheet follows the formula described in the text to arrive at the recovery figure of $5,287,277. "Earnings" is the value of projected sales: $10,565,028. This figure is reduced by non-continuing expenses. Eastern has separated non-continuing expenses into two categories. The first category is under the heading "less" and totals $4,563,098. When this amount is subtracted from the earnings figure, $6,001,930 remains. The second category is under "General & Administrative Exp." Under the heading "Projected," the insured has added all expenses, continuing and non-continuing. This amount totals $3,145,834. This amount is also subtracted from earnings, leaving $2,856,096. The insured then added all of the continuing "general and administrative expenses" (found in the right-hand column) to the $2,856,096. figure to arrive at the final claim of $5,287,277. The effect of subtracting all continuing and non-continuing expenses from earnings and then adding all continuing expenses was to reduce earnings only by the amount of non-continuing earnings in accordance with the formula in the policy.
 
 
 [17]
 Eastern's reliance upon Supermarkets Operating Co. v. Arkwright Mut. Ins. Co., 257 F.Supp. 273 (E.D.Pa.1966), is misplaced. In Supermarkets the insured's market was destroyed by fire. The policy was similar to the one at bar in that recovery was measured by the formula, "gross earnings, less all charges and expenses which do not necessarily continue during the period of interruption ..." Id. at 276. The insurer argued that the insured's lease payments on the destroyed building were an expense which did not necessarily continue after the fire because the destruction of the building terminated the obligation to pay rent. Id. at 275. The court however, found that the obligation to pay rent continued, and that the lease payments were not a "not necessarily continuing expense." Accordingly, the insurer was not permitted to reduce the recovery by the amount of the lease payments. The case did not address the question of new expenses
 
 
 [18]
 The phrase "loss hereunder" is also used in the first sentence of paragraph 10-b of the policy providing that "recovery in the event of loss hereunder shall be the ACTUAL LOSS SUSTAINED ... not exceeding the reduction in earnings less charges and expenses which do not necessarily continue ..." In both contexts we believe the phrase "loss hereunder" plainly refers to loss compensated under the policy
 
 
 [19]
 The policy read: "Expense to Reduce Loss: This policy insures such expenses as are necessarily incurred for the purpose of reducing any loss under this policy (except expense incurred to extinguish a fire) not exceeding, however, the amount by which the loss under this policy is thereby reduced, and such expenses shall not be subject to the application of the contribution clause." Id. at 930