**COTTON BROTHERS BAKING COMPANY, INC.**

v.

**INDUSTRIAL RISK INSURERS.**

**COTTON BROTHERS BAKING COMPANY, INC.**

v.

**BAKER PERKINS, INC.**

**BAKER PERKINS, INC.**

v.

**COTTON BROTHERS, INC.**

Civ. A. Nos. 83–0150–A, 83–0578 and 83–3237.

United States District Court, W.D. Louisiana, Alexandria Division.

July 31, 1989.

Dermot S. McGlinchey and Henri Wolbrette, III, McGlinchey, Stafford, Mintz & Cellini, New Orleans, La., and Frederick B. Alexius, Provosty, Sadler and DeLaunay, Alexandria, La., for Cotton Bros. Baking Co., Inc.

P. Albert Bienvenu, Jr. and John W. Waters, Jr., Bienvenu, Foster, Ryan & O'Bannon, New Orleans, La., and Howard B. Gist, Jr., Gist, Methvin, Hughes & Munsterman, Alexandria, La., for Indus. Risk Insurers.

Esmond Phelps, II, Phelps, Dunbar, Marks, Claverie & Sims, New Orleans, La., for Baker Perkins, Inc.

## OPINION

NAUMAN S. SCOTT, District Judge.

We have jurisdiction under 28 U.S.C. § 1332. There is diversity of citizenship between the plaintiffs and the defendant and the matter in controversy exceeds, exclusive of interest and costs, the sum of $10,000.00.

Plaintiffs reside in and the instant claim arose in the Western District of Louisiana. Venue therefore lies in this district under 28 U.S.C. § 1391(a).

Plaintiffs Cotton Brothers Baking Company, Inc. (Alexandria bakery) and Cotton Bros. Inc. (parent company) have brought suit against Industrial Risk Insurers (IRI) claiming damages under an interruption of business policy (IRI policy) issued by IRI on October 1, 1980 in favor of three (including Alexandria bakery) of five corporate bakery subsidiaries owned and operated by Cotton Bros., Inc. Cotton Bros., Inc. was not included in the IRI policy as a named insured.

The interruption of business occurred as the result of a fire in the Alexandria bakery plant, Alexandria, Louisiana on February 13, 1981.

Under the provisions of the IRI policy the only named insured eligible to bring suit for an interruption resulting from a fire on the property of the Alexandria plant was Cotton Brothers Baking Company, Inc.. Suit was filed on January 12, 1983 against IRI for loss or reduction of gross earnings as provided in Sections IA and IIA of the IRI policy (earnings damages) allegedly suffered by the Alexandria bakery during the period of interruption following the fire of February 13, 1981. The principal issue between the parties during the entire period of trial from the middle of September 1986 until the Friday before Christmas of that year was the methodology to be used in the determination of earnings damages as provided in the policy under Sections IA and IIA. Plaintiff contends that the books and the records of the parent corporation are the only books and records from which such damages can be compiled. IRI has not paid any earnings damages as provided under Sections IA and IIA based on the records of its named insured Cotton Brothers Baking Company, Inc. (Alexandria bakery). IRI simply refuses to recognize any damages except those compiled on an item by item basis in which each item claimed must be shown to be a direct result of the fire. IRI made a general objection to any evidence based on the books and records of the parent company because the parent company was not a named insured under the IRI policy.

This case was tried by the plaintiff, Alexandria bakery, and the defendant, IRI, until our ruling on the fourth day of May 1988. On November 4, 1987, plaintiff, Alexandria bakery, filed a post-trial motion to permit the filing of a second supplemental and amending complaint. The said complaint prayed that the parent company, Cotton Bros., Inc., be made a party to this suit and that the interruption of business policy issued by IRI on October 1, 1980 be reformed so as to include Cotton Bros., Inc. as a named insured effective October 1, 1980. In our rulings of May 4, 1988 and July 27, 1988 we allowed the supplemental and amending complaint to be filed, made Cotton Bros., Inc. a party plaintiff effective from the commencement of suit, but refrained from considering and deciding the reformation of policy issue until a hearing could be had at which the parties would have an opportunity to introduce additional evidence. That hearing was held on February 27, 1989 and subsequently authorities were submitted by both parties. We now consider, (1) the issue of whether the policy issued by IRI on October 1, 1980 should be reformed so as to include Cotton Bros., Inc. as a "named insured" effective October 1, 1980 and (2) all other issues remaining for decision in this proceeding.

To the extent any of the following Findings of Fact constitute Conclusions of Law, they are adopted as Conclusions of Law; to the extent any of the following Conclusions of Law constitute Findings of Fact, they are adopted as such.

## FINDINGS OF FACT

1. Cotton Brothers Baking Company, Inc. and Cotton Bros., Inc. are Louisiana

corporations with their principal place of business in Alexandria, Louisiana. Defendant Industrial Risk Insurers is an unincorporated association with its principal place of business located outside the State of Louisiana. No member thereof is a citizen of Louisiana. The fire of February 13, 1981 occurred in Alexandria, Louisiana in the Western District of Louisiana and plaintiffs' claims in this proceeding exceed the sum of $10,000.00.

2. In 1952 and for some time thereafter the Cotton interests (Cotton) consisted of one bakery located in Alexandria, Louisiana.

3. Thereafter and prior to 1976 Cotton acquired three additional bakeries located at Shreveport and Baton Rouge, Louisiana and Natchez, Mississippi. After these acquisitions the four bakeries continued to operate independently and in competition with each other in all fields, including management, production, and sales to the public.

4. At some time prior to 1970 Cotton became interested in protecting these separately and independently operated bakery businesses from financial loss of income induced by fire or other similar or named peril.

5. With this objective in view Cotton, through its agent Alexander & Bolton (A & B), discussed with IRI the relative merits of coverage: 1. by extra expense insurance or 2. by interruption of business insurance. Extra expense insurance is a form of insurance coverage to reimburse the insured for specific items of extra expense over and above the normal expense which the insured incurred as a result of damage to the insured's property by an insured peril such as fire. Damages under such a policy have no connection whatsoever to the gross earnings of the insured.

An interruption of business policy insures the owner of a business against reduction or loss of gross earnings during the period of interruption. Damages consist of the reimbursement of gross earnings lost in the insured's business less the recurring expenses which do not continue during the period of interruption. Needless to say the principal item of damages in such a policy is the loss or reduction of gross earnings as shown on the books of the insured's business. Also included in damages under an interruption of business policy are items of extra expense necessarily incurred for the purpose of reducing loss under the policy and such expenses, in excess of normal, as would necessarily be incurred in replacing any finished stock used by the insured to reduce loss under the policy.

6. On or about 1970 Cotton and IRI chose business interruption type coverage. *Both Cotton and IRI intended at that time and at all times thereafter through October 1, 1980 to give the Cotton bakery operation full and complete interruption of business coverage.* To accomplish this in 1970 IRI issued a separate policy to cover each of the four bakeries. In this way they achieved the intent of both parties because each of the four bakery corporations carried on its own separate and individual operation and business. Actually they were in competition with each other. Each of these bakery corporations was operating independently and separately with no interdependence between them, manufacturing its own production for sale on the open market, packaging its own finished products, and selling to its own customers. Therefore the books of each corporation could serve as a basis for the determination of gross earnings and any increase or reduction of gross earnings over a period of time. In this way the common intent of both parties was achieved and complete business interruption coverage of the entire Cotton bakery operation continued until the reorganization of 1976.

7. In 1976 the Cotton bakery operation was completely reorganized. The parent company, Cotton Bros., Inc., was created and thereafter operated the Cotton bakery operation through seven wholly-owned subsidiaries, as one single bakery business. The seven wholly-owned subsidiaries consisted of the four bakery corporations previously owned by Cotton and three newly created non-bakery subsidiary corporations:

an insurance subsidiary, a transportation subsidiary and a procurement subsidiary. The insurance subsidiary handled all the health and welfare, self-insurance and other insurance responsibilities of the parent corporation and all subsidiaries. It did not do business with the general public. The sole responsibility of the transportation subsidiary was to furnish and satisfy the transportation needs of the parent corporation and its subsidiaries. Like the insurance subsidiary it did no business with the general public. The sole responsibility of the procurement subsidiary was to furnish raw materials, supplies and equipment required by the parent company and its subsidiaries. Like the other two non-bakery subsidiaries, the procurement subsidiary did no business with the general public.

After reorganization none of the bakery subsidiaries produced the entire variety of bakery products it sold to the public, as each of them had done previous to the reorganization. An entirely new system of production was introduced. The parent corporation dictated or allocated to each bakery subsidiary the type and amount of bakery items each could produce, the amount that each could retain for its own customers, to whom each could ship the remainder and the amount and price at which these shipments could be made. Thus the entire production of each was dedicated to the single bakery business of the parent corporation, Cotton Bros., Inc.

All of this was accomplished under the direction of Gene Cotton. When the parent corporation and the three non-bakery subsidiaries were created in 1976, these three non-bakery subsidiaries as well as the four formerly independent bakeries became wholly owned subsidiaries of the parent corporation. Gene Cotton, president and chief executive officer of the parent corporation, was also president and chief executive officer of all seven subsidiaries. As such he had the power and control to carry out, on a day to day basis, in detail the aims and purposes of the reorganization and to see that the aims, policies and efforts of all subsidiaries, including the bakery subsidiaries, were dedicated to the promotion and success of the single bakery business operated by the parent company. Thus the bakery subsidiaries lost all semblance of their former independence. They no longer controlled their health and welfare and other insurance, their transportation or their procurement needs. Since Gene Cotton was president and chief executive officer of each supplying subsidiary as well as each consuming subsidiary, he set the terms and conditions of all contracts and agreements between the subsidiaries; including price, at which all these inter-subsidiary services were provided. Thus none of the agreements or contracts between the seven subsidiaries were arm-length transactions negotiated and concluded by officers motivated by the separate and independent interest each of the subsidiaries involved, but rather by the interest of the parent corporation—the single operation. In every instance these contracts amounted to Gene Cotton, wearing one hat, doing business with Gene Cotton wearing another hat, for the open and declared benefit of Gene Cotton wearing the hat of the parent company.

8. A very clear illustration of the monumental effect which the reorganization had on the previously independent bakery corporations is furnished by the experience of the Natchez bakery subsidiary. After reorganization that plant produced nothing but sweet goods such as pies, cakes, pastries and breakfast bakery products. Ninety percent of that output was shipped to the three other bakery subsidiaries under contracts dictated and controlled by the parent company. These shipments were delivered to the other three bakery subsidiaries by transport units furnished by the transportation subsidiary under contracts dictated by the parent company. In order for Natchez to compete in its sales area it was necessary for Natchez to acquire from the three other bakery subsidiaries all the rolls, buns, brown and serve, and various types of loaves, etc. which it sold to the public. If the comptroller was right in estimating that sweet goods provided twenty percent of the total bakery goods necessary to compete on the market then the sweet goods retained by Natchez com-

prised twenty percent of the bakery products sold by Natchez in its sales to the public. Thus Natchez had to acquire eighty percent of the products sold by it in its sales area from the other three bakery subsidiaries. With its health, welfare and other insurance items, its transportation needs, its procurement needs furnished under controlled contracts; ninety percent of its production sold to the three other bakery subsidiaries under controlled contracts, and eighty percent of the products sold by it being acquired by controlled contracts, there is absolutely no way that the Natchez operations could be considered an independent bakery business or that its books could reflect a genuine and actual loss or gain of gross earnings, as if it were a separate business. We find that the reorganization converted the Cotton bakery operation into one single bakery business owned and operated on a day to day basis by the parent company: that the books and records of the parent company were the only books and records which could serve as a basis for determining gross earnings of the Cotton bakery business and that the books and records of none of the bakery subsidiaries could serve this purpose.[1]

9. Nevertheless in 1976 IRI, on its own initiative and without any request or direction from Cotton, abandoned its practice of issuing four separate interruption of business policies to cover each of the Cotton bakeries. Why did IRI issue a single combined policy? IRI states that it did so because the four bakery subsidiaries had become "interdependent". A glance at any Webster's dictionary will disclose that this term means "to depend upon one another", "mutual dependence" and "mutually dependent". How did IRI know that they had become "interdependent" and what were the changes in operation which made them "interdependent"? IRI knew that the parent company, Cotton Bros., Inc., had been created; that Cotton Bros., Inc. was now the sole owner of seven subsidiaries including the bakery subsidiaries; that Gene Cotton, president and chief executive

officer of the parent company, was also president and chief executive of each of the seven subsidiaries; that, through its exclusive ownership and exclusive direction, the parent company had assumed and exercised absolute control over the day to day operation of each of the bakery subsidiaries; that the parent company had utilized its absolute control to reallocate the production of each of the bakery subsidiaries; that as a result of this reallocation each of the bakery subsidiaries had ceased to produce the entirety of the bakery products which it sold to the public. In fact, none of them produced even one-half of the production which each of them sold to the public. These are the changes in operation by which the bakery subsidiaries became "interdependent".

IRI had to have knowledge of these changes to conclude that the bakery subsidiaries were in fact "interdependent". Certainly IRI was aware of the most important element of "interdependency"—the reallocation of production. IRI was the fire insurer, and as fire insurer, made frequent inspections of each bakery's machinery, equipment and safety devices, especially at this time of unusual change. Those IRI inspectors were certainly aware of the exchange and relocation of machinery and equipment made necessary by the reallocation of production between the bakery subsidiaries and also the results in terms of the amount and type of production each bakery subdivision was required to produce. Both Cotton and IRI intended to give full interruption of business coverage to the Cotton bakery operation. But having all the factual information necessary to make the determination, they simply failed to realize that the reorganization had merged the four formerly independent bakery businesses into one single bakery business owned, managed and operated by Cotton Bros., Inc.[1]

10. The evidence establishes beyond possible doubt that the single policy issued by IRI in 1976, omitting Cotton Bros., Inc.

---

**1.** In its post hearing suggested findings and conclusions and supporting briefs, IRI does not address these issues.

as a named insured, was intended to cover the flow of gross earnings from the combined production of the four bakery subsidiaries owned, managed, operated and controlled as a single business by Cotton Bros., Inc. It was the mutual mistake of IRI and Cotton that Cotton Bros., Inc. was not identified as the sole named insured. Having made the mistake when the policy was issued, IRI certainly should have realized the mistake and corrected it in April of 1977 when A & B, in correspondence with Mr. Penn of IRI, questioned the validity of the coverage and disclosed that production of the Natchez plant was restricted to sweet items and that ninety percent of that production was shipped to the other three bakery subsidiaries. Mr. Penn brought an end to the correspondence by assuring A & B that the Cotton business was fully covered by the "blanket policy" concept. Mr. Penn never explains how the "blanket policy" concept is to be applied to earnings damages under Sections IA and IIA of the policy. Certainly IRI paid no such damages in this case.

IRI's failure to include Cotton Bros., Inc. as a named insured on the policies of 1976 and 1980 effectively deprived Cotton of its right to make a claim under Sections IA and IIA of the policy (earnings damages), the specific risk that IRI was paid to cover.

11. Although the failure to name Cotton Bros., Inc. in the policy was the mutual mistake of Cotton and IRI, that mistake was initiated by IRI which issued the single policy on its own form without a request or direction from Cotton. When IRI issued its policy of October 1, 1980, the Cotton bakery business still was operating in the manner in which it had been reorganized in 1976 except that Cotton Bros., Inc. had acquired an additional bakery (Monroe, Louisiana). There were now five bakery subsidiaries instead of four. IRI continued to require its worksheets from the separate bakery subsidiaries, but all these worksheets, at least all of those in evidence, were signed by the comptroller or the vice-president of finance of the parent company. Changes in operation for the purposes of efficiency or economy were made repeatedly, ignoring completely that each of the subsidiaries was separately incorporated. For instance, customer routes were regularly transferred from one bakery subsidiary to another. Officers in the subsidiaries were promoted to the parent company.

On October 1, 1980, IRI simply renewed the policy of 1976. There is no doubt that both Cotton and IRI intended on October 1, 1980 that the IRI policy give full and complete coverage to the Cotton bakery business. Its failure to do so was the mutual mistake of Cotton and IRI.

12. On Friday, February 13, 1981, a fire erupted in the Alexandria bakery on U.S. Highway 71 South in Alexandria. The Alexandria bakery was the largest of the bakery subsidiaries. It contained three production lines. Its principal line was a combination line which produced brown and serve and loaf bread. One small line produced burger buns and the other small line produced hard bread and hard buns. The combination line was almost completely destroyed. Brown and serve comprised 75% to 80% of the Alexandria bakery's production. None of the other subsidiaries produced brown and serve. Alexandria was Cotton's sole source of that production.

13. The effect of the fire on the Alexandria bakery and on the Cotton bakery business was serious. The parent company was unable to produce loaf bread and brown and serve products in its Alexandria plant over the months of the interruption. For a less lengthy time it could not produce from the small lines. These products had to be purchased from competitors at prices higher than Cotton's costs of manufacture. At times the inferior quality of the purchased items caused dissatisfaction among Cotton customers and even provoked cancellation of purchase contracts. Other forms of disruption were the questionable success of making up production from other plants; the utilization of normally productive workers (as far as the production of bakery products was concerned) in nonproductive work such as the very substantial clean-up operation, unforeseen repairs and the gigantic job of installing replacement equipment under supervision of Baker Perkins representatives. Accounting

personnel had to take substantial leave from normal responsibilities to aid specially hired accountants in the company's attempts to determine its losses. Immediately after the fire, Gene Cotton and a number of other Cotton officials were totally involved in clean-up efforts; in negotiations with IRI and with Baker Perkins trying to determine what repairs or replacements would have to be made to restore the facilities that were destroyed by fire; securing contract proposals, accelerating those proposals, determining the final contract and the financing of the contract. There was continuous contact with the same parties in their efforts to accelerate the performance of the replacement contract to the evident advantage of both the parent company and IRI. Also involved were the increased costs and involvement of transportation vehicles and personnel. Indeed the effect of the fire on the parent company's bakery business was more than serious, it was devastating.

14. On the very day of the fire Gene Cotton contacted Baker Perkins to send a representative to Alexandria to examine the extent of the fire damage for the purpose of making proposals for the repair or replacement of the damaged facilities as expeditiously as possible. Two or three days thereafter Cotton, with the knowledge and consent of IRI, flew to Saginaw, Michigan to receive and discuss Baker Perkins' proposals and to conclude a contract as soon as possible. Gene Cotton chose Baker Perkins for this endeavor because Cotton had been doing business with Baker Perkins since 1953. Most of Cotton's equipment, including the oven and the proofer and some of the other equipment involved in the fire, had been manufactured by Baker Perkins. Baker Perkins was therefore the manufacturer most familiar with the plant and with the capabilities, the location and the pattern of operation of Cotton's machinery and equipment.

Baker Perkins first presented two proposals, one a repair proposal and the other a replacement proposal. Under the former proposal Baker Perkins was to complete repairs of the oven and proofer by January 1982 at a cost of $1,030,085.00. However, this was not a firm contract. Since Baker Perkins had not been able to make an accurate determination of the damage to the oven, and might not be able to do so until the repaired equipment was in operation, it reserved the right to take additional time and make additional repairs and charges if such repairs became necessary. Secondly, Baker Perkins proposed to replace the proofer and the oven by June 1, 1982 for the price of $1,189,245.00. With the knowledge and consent of IRI, Gene Cotton rejected these proposals because of the long length of time required for installation. At the vigorous urging of Gene Cotton, Baker Perkins submitted a third proposal. For an increased price of $1,354,820.00 Baker Perkins would accelerate replacement so as to assure "start-up" of normal production by September 21, 1981. Cotton, as IRI was aware, was depending on money to be received from IRI in the adjustment of Cotton's claims under the fire policy. The significant reduction in the length of the business interruption period was mutually beneficial to IRI and Cotton. Cotton, with the approval of IRI, accepted the third proposal.

15. The Alexandria fire illustrates the extreme interdependence of the various Cotton subsidiaries and the absolute futility of omitting Cotton Bros., Inc. as the named insured. The bakery business, at the level at which Cotton was competing, is a very demanding business. The entire production for today is on customer shelves tomorrow. The pressure to produce required Cotton to operate its bakeries 20 hours a day, 6 days a week. There is no surplus inventory at either end of the delivery route to ease the impact of mistake or delay. In order to compete, the bakery products had to be fresh. The crisis here was far different from the crisis which would have occurred if the Alexandria bakery was still operating as a separate and independent business on October 1, 1980. An independent operation in Alexandria would have affected only production and customers of the Alexandria bakery. The evidence here precludes such a finding. In this instance, the parent corporation was

relying on its Alexandria subsidiary to furnish certain bakery items, principally brown and serve, to all of its other bakery subsidiaries. The inability of the Alexandria bakery to produce brown and serve was not felt by the Alexandria bakery alone. Every bakery subsidiary in the Cotton operation lost its allocated portion of that production. The Alexandria customers were no more severely affected than those of Shreveport, Baton Rouge, Monroe or Natchez. Certainly the customers of the other bakery subsidiaries were not arms length customers of Alexandria. The reorganization had indeed converted five independent bakery businesses into one business owned, controlled and operated on a day to day basis by the parent corporation.

16. Gene Cotton was *the* expediter in this crisis. He had the problem of maintaining an unusually high cash flow to continue operating the highly complex and competitive business described above. Suddenly he had in addition, the responsibility and tremendous expense of immediate replacement of a major portion of the parent company's production, by purchase from competitors, by establishing new lines in other bakery subsidiaries, by reallocation or otherwise; an unexpected clean-up operation; the fate of employees idled by the fire; the restructuring of transportation and procurement to meet the crisis and, most importantly, the execution and performance of a replacement or repair contract.[2] Although it was important to IRI that the interruption be terminated as soon as possible, it was infinitely more important to Gene Cotton and his business to achieve this result. He had an additional problem. He did not have the money to do it. IRI knew this. Baker Perkins had required that the proofer and oven replacement contract be executed on or before February 22, 1981. Gene Cotton had negotiated the contract and could have accepted it immediately, had the funds been available. Funds did become available from IRI on March 6, 1981, and Cotton instantly telephoned his acceptance to Baker Perkins, which did not protest the delay. The major portion of the testimony by deposition of R.F. Kelley, President of Baker Perkins, was his amazement, mounting irritation and annoyance at Gene Cotton's continued, unending and persistent demands for more speed, for quicker deliveries.

Gene Cotton was able to retain some of the employees made idle by the destruction in the Alexandria plant. He continued their employment and used them initially in "clean-up" operations and later in the installation of equipment under supervision of Baker Perkins. At other times they were free to perform whatever duties the Alexandria bakery could find for them, such as the clean-up and/or maintenance of equipment idled or less severely damaged by the fire. IRI has alleged that Gene Cotton contributed to the delay by directing these employees to take a Christmas vacation and to perform duties other than their duties under the supervision of Baker Perkins. The record reflects, as noted by Mr. Kulzer below, that there were many periods, sometimes extended periods, when Baker Perkins failed to make scheduled deliveries of equipment for installation. Cotton's employees could not install equipment when the equipment had not yet been delivered. Certainly Cotton could not allow them to remain idle during the periods of non-delivery. IRI has failed to produce any protest by Baker Perkins or any evidence indicating what particular Baker Perkins installation was delayed or for what period of time, or that Gene Cotton had anything to gain by delaying Baker Perkins. We find that due diligence and dispatch was exercised by plaintiffs to rebuild, repair or replace the property and equipment destroyed and/or damaged by the fire as required by the IRI policy.

In a state of desperation at Baker Perkins' lack of performance, Gene Cotton hired a responsible and trusted employee of Baker Perkins, James Reid (Reid) in February, 1982. Reid was the very person whom

---

2. For a picture of the situation immediately following the fire see reports of meetings held by representatives of Cotton Bros., Inc, IRI and others. Exhibits P–67, 68A, 101, 122 and 122A. (par. 16)

Baker Perkins had sent to Alexandria on the day after the fire to estimate and ascertain the damage done by the fire. All Baker Perkins' proposals for repair or replacement were based on his findings. IRI's Mr. Kulzer noted in his August, 1982 report the efforts by Gene Cotton to reduce the delays caused by Baker Perkins:

"As previously reported, Baker–Perkins incurred delays in shipping and installing the equipment. *The insured constantly attempted to push B–P's schedules and has documented his steps carefully.* His smartest action was to hire Janus [sic] Reid away from B–P shortly prior to shipment of the equipment. Mr. Reid supervised and expedited the installations and obviously prevented further delays in start up with his deep knowledge of the equipment and personal relationship with the B–P installations." (emphasis ours)

IRI's contention that Gene Cotton was more interested in modernization of the equipment, than he was in the installing of it, is not tenable, especially when IRI mentions no instances in which such alleged activity affected or delayed any specific Baker Perkins installation. In any operation when the damaged or destroyed equipment is replaced by new equipment, to install is to modernize. The atmosphere of the meetings between plaintiffs and IRI establishes that Gene Cotton was the individual who made, far and away, the most vigorous and dedicated effort to expedite the end of the interruption period. The financial crisis brought on by the fire, the lack of cash flow, could be remedied only by the resumption of normal production by the Cotton bakery operation. Gene Cotton stated this position repeatedly, and his actions were consistent with it.

17. Although specification of a period of interruption can never be exact, we find that Cotton exercised the required due diligence and dispatch to rebuild, repair or replace, at the earliest date possible, the property and equipment destroyed in the fire of February 13, 1981 and that production equal to February 13, 1981 production

was achieved on May 8, 1982. See paragraph 28, infra.

We agree with IRI that the delidder did not replace any equipment damaged or destroyed by the fire. Before the fire the delidding operation was accomplished manually by two employees. This activity occurred at the end of the interruption period when most of the other equipment had already been installed so that it did not interfere seriously with installation of other equipment. However it did have the effect of extending that period. We find that 3% of the interruption period was caused by the installation of this equipment and that Cotton Bros. Inc. was responsible for that delay.

However, we find that Cotton's responsibility for delay is offset by the delay occasioned by IRI's refusal to pay the $1,354,-820.00 March 6, 1981 proof of loss to Cotton under IRI's fire policy for the destruction of Cotton's oven and proofer. See par. 24, infra. IRI was in contact with Baker Perkins throughout the period around March 6, 1981 when Cotton verbally accepted the accelerated contract to replace that equipment. Within days after that acceptance Baker Perkins President Kelly issued an interoffice memorandum halting performance of Baker Perkins' accelerated replacement contract until further notice. We find no explanation for this inappropriate action except Baker Perkins' knowledge of IRI's refusal to pay the March 6, 1981 proof of loss. Baker Perkins' February 22 deadline had already been exceeded by 12 days. IRI's unlawful actions forcing Cotton to convert $324,735.00 of the agreed fire loss to expediting expense under the interruption of business policy consumed at least seven or eight additional days. If that delay caused Cotton to lose favorable placement in Baker Perkins' list of orders, the delay could be even more substantial.

We find therefore that both Cotton and IRI performed acts which may have delayed "start-up" to May 8, 1982. Although the extent of delay caused by each cannot be ascertained, we find that they were approximately equal so that neither party

shall be penalized.[3]

18. IRI's contention that the adoption of Baker Perkins' repair proposal would have assured "start-up" in 45 weeks is irrelevant since IRI was as fully responsible as Cotton for rejecting the repair proposal and accepting the accelerated replacement contract.

It is also completely discredited by the evidence. The repair proposal, on its face, was not a firm proposal. It explicitly limited repairs to those defects apparent at the time of initial examination and, very significantly, did not cover defects which might be disclosed after the equipment went into operation. Baker Perkins reserved the right to require additional time and additional money to accomplish any repairs not apparent at the time of the original examination. In fact subsequent inspections disclosed that the proofer was a total loss and that the oven could not be repaired to meet safety standards. Neither could be repaired; both had to be replaced.

In addition, unlike the two replacement contracts which provided for "start-up" by June 1, 1982 and September 21, 1981, respectively, the repair proposal provided only that the *physical repair* of the proofer and the oven would be completed in 45 weeks. This language is on the face of the proposal. Mr. Reid who drafted the proposal for Baker Perkins emphasized repeatedly in his testimony that additional tests, including tests with dough in the pans, had to be completed successfully before "start-up" could be achieved. The time necessary to accomplish this is always uncertain. It could be three weeks; it could be three months. IRI's contention must be rejected.

19. Immediately after the fire, each of the parties formed a team of certified public accountants to adjust the plaintiffs' claims under the interruption of business policy. The plaintiffs' team was composed of members of Ernst & Whinney, CPAs, including Arthur J. Parham, and was headed by Percy Raybourn, Vice President of Finance of Cotton Bros., Inc.[4] This team also included representatives from W.E. Long & Company, specialists in bakery operations. The team designated by IRI was composed of members of the firm, Matson, Driscoll & Damico, CPAs, led by Michael Driscoll, a senior partner in the firm.

None of the members of the Cotton team had any education, training or experience in the adjusting of insurance claims and particularly claims under interruption of business policies. The IRI team, on the other hand, did have such experience; all of them were intimately familiar with and had been involved in the adjusting of interruption of business claims. Driscoll was not simply a CPA, he was offered by IRI and recognized by this Court as an expert in interruption of business insurance who had been involved in the adjustment or litigation of over one thousand interruption of business claims. In most of these instances, he had represented insurance companies and had been retained many times by IRI.

20. The IRI policy was intended to provide full coverage for the Cotton bakery business. The only named insureds were three of the subsidiary bakeries in the Cotton Brothers operation, located in Alexandria, Shreveport, and Natchez: Cotton Brothers Baking Company, Inc., Cotton Baking Company, Inc., and Cotton's Hol-

---

**3.** We disagree with the jury in Civil Action 83–3237–A, Baker Perkins, Inc. versus Cotton Bros., Inc. There the jury determined that Baker Perkins, Inc. was responsible for 65% and Cotton Bros., Inc. for 35% of that portion of the business interruption period beginning September 21, 1981 and terminating May 8, 1982. We have found, on the other hand, that Cotton Bros., Inc. was responsible for 3% of the delay during that period, and that IRI was equally responsible so that neither of them shall be penalized.

**4.** For reasons undisclosed by the record, a rift occurred between Cotton and Alexander & Bolton on or about the time of the February 13, 1981 fire. No member of that firm was included in the Cotton team or took part in the determination of Cotton's claim methodology or the drafting of interruption proofs of loss. There is no evidence that Cotton sought or received their advice on those subjects. The only evidence of any activity on their part was their attendance at some of the meetings mentioned in Note 2, supra, and Gene Cotton challenged their presence at those meetings.

sum Bakers, Inc., respectively. The policy did not mention Cotton Bros., Inc. as a named insured, although Cotton Bros., Inc. had been operating the Cotton bakery operation as a single bakery business on a day to day basis since the reorganization of 1976. However, the policy described five locations (Alexandria, Shreveport, Natchez, Baton Rouge, and Monroe) as covered premises and further provided that the loss of any of these locations should be adjusted with and payable to the subsidiary bakery corporation located at the site of the loss. Separate coverage amounts were assigned to each location and aggregated on October 1, 1980 to $39,816,000.00.

21. We have found previously that both Cotton and IRI intended in 1976 and all times thereafter through October 1, 1980, to give the Cotton bakery operation full and complete interruption of business coverage. However, the fire on February 13, 1981, compelled IRI to re-examine its policy and its position as insurer under that policy. It had possessed, since the reorganization of 1976, all the information necessary to determine that the subsidiary bakeries, though still incorporated, had become so interdependent with the other subsidiaries and so completely controlled by the parent corporation that they were merely production plants for the bakery business owned, controlled and being operated on a day to day basis by the parent company.

Raybourn has testified that the indebtedness of the subsidiaries (except the procurement subsidiary) was paid out of the general fund of the parent corporation. If IRI did not know this prior to February 13, 1981, it certainly knew it shortly thereafter, when IRI had access to the books of these subsidiaries while auditing the claims submitted by Cotton. IRI knew specifically that all of the replacement equipment ordered in the name of the Alexandria plant; invoiced, shipped to, installed in, and belonging to the Alexandria plant; was paid for out of the general fund of Cotton Bros., Inc.

IRI, at some time during the auditing period and prior to September, 1981, knew that the IRI policy, as written, did not provide interruption of business coverage to the Cotton bakery business as was intended by all parties to the policy. They knew that, after the 1976 reorganization, the bakery subsidiaries had lost their separate identities and had become so interdependent with the other subsidiaries and so dominated and controlled by Cotton Bros., Inc. that they were no longer viable and proper interruption of business insureds. Although IRI stoutly proclaims the validity of its policy, there is not one instance in which it has shown or even suggested that a claim for earnings damages can be supported by the books of the Alexandria bakery. Not one of its experts, including Driscoll, has made such a declaration. The fact that the books and records of the named insured, Cotton Brothers Baking Company, Inc. (the Alexandria bakery subsidiary), cannot serve as a basis for a claim for earnings damages under the IRI policy, is the basic element of IRI's strategy of defense to avoid the payment of earnings damages under Sections IA and IIA of the policy. It knew that Cotton Bros., Inc. was the only party owning and operating the Cotton bakery business so that Cotton Bros., Inc. alone had an interruption of business risk. Had IRI continued the good faith that it had exhibited during the 10 years that it had been collecting premiums from Cotton, it, on its own initiative, could and should have issued an endorsement making Cotton Bros., Inc. a named insured, thus providing Cotton the interruption of business coverage for which Cotton had paid. Instead, IRI chose to ignore the evidence before it; to profit by its inadvertent omission of Cotton Bros., Inc. as a named insured; to ignore its duty to correct that mistake so that the Cotton bakery business would receive the interruption of business coverage intended. This is the beginning of IRI's strategy to defeat interruption of business coverage by depriving the Cottons of access to the books and records of Cotton Bros., Inc. This effort began shortly after the fire of February 13, 1981, as above set forth and has continued to this day. From the very commencement of this proceeding, IRI has made a continuing objection to the admission of evidence based

on the books and records of the parent company to establish earnings damages as provided in the policy. Its sole basis for that objection is that Cotton Bros., Inc. is not a named insured in the policy. IRI's strategy is further reflected in the pleadings and throughout the trial of this suit including its strenuous opposition to the reformation of the policy. We find that IRI should have made Cotton Bros., Inc. a named insured on its own initiative at some time prior to September 1981, in order to give full interruption of business insurance coverage to the Cotton bakery business which had been operated by Cotton Bros., Inc. on a day to day basis since the reorganization of 1976. Indeed, upon a simple letter request it did make Cotton Bros., Inc. a named insured with no additional payment of premium by an endorsement dated July 28, 1982.[5] We find that its failure to make such an endorsement during the auditing period prior to September 1981 was a breach of its prior intent and its duty to give full interruption of business coverage to the bakery business owned and operated by Cotton Bros., Inc.. IRI's failure to do so was part of a scheme to deny such coverage to Cotton and its failure to act was arbitrary, capricious and in absolute bad faith.

22. IRI hired Matson, Driscoll & Damico on February 18, 1981, only five days after the occurrence of the fire. They were retained by IRI because, according to their testimony, they were not in the usual business of auditing but specialized in adjusting interruption of business claims. Driscoll was qualified and offered by IRI and accepted by the Court as an expert on the adjustment of interruption of business claims.

Cotton's team of auditors knew nothing about interruption of business insurance, but they did know that no items listed in any proof of loss submitted by them to IRI would be paid without the approval of IRI based on the recommendation of IRI's auditing team. Consequently, Percy Raybourn, by telephone, by personal contact and in meetings, sought advice, help and recommendations from Michael Driscoll and other members of IRI's team for developing a proper methodology to calculate Cotton's interruption of business losses.[6] The re-

---

5. At the request of A & B, IRI, without protest, made Cotton Bros., Inc. a named insured by an endorsement dated July 28, 1982. Since there was no difference in Cotton's method of operation between October 1, 1980 and July 28, 1982, we consider this an admission by IRI that Cotton Bros., Inc. could have been included in the policy as a named insured on October 1, 1980. In order to carry out the intention of the parties and afford the Cotton bakery business the coverage it had been paying for since 1970, Cotton Bros., Inc. should have been so named.

The last paragraph of Post-fire Endorsement No. 8, dated September 26, 1981, was included at IRI's initiative and requested by no one. These endorsements establish that endorsements were regularly made by IRI in a most informal manner and on its own initiative.

6. Testimony of Arthur J. Parham, Jr., Tr. vol. 22 pp. 4978–4981.

Q What was your understanding, Mr. Parham, about what your task was regarding assisting Mr. Raybourn to prepare some sort of methodology for computing this claim?
A Mr. Raybourn indicated we were going to have to try to identify each and every type of expense, lost revenue, that sort of thing and on a line item by line item approach in order to submit claims to the insurance company that they would accept.

Q Okay, Mr. Parham, I want to show you a document captioned methodology for computing the cost of business interruption which has previously been admitted in evidence as plaintiff's exhibit 66 and ask you if you recognize that?
A Yes, sir, I do. I wrote this.
Q You wrote it?
A This memorandum.
Q What was its purpose, sir?
A The purpose was as I mentioned a moment ago to begin the document and approach if you would methodology to assemble the information necessary to submit claims to the insurance company and as you see if you read through this, it was very detailed in the sense that there were a number of specific line items mentioned and we thought it necessary at that point based on the suggestions of the insurance company and its representative to go through and try to quantify each and every one of the items to submit a claim.
Q Did you ever meet with any representative of the insurance company to determine whether there line item approach was what the insurance company wanted?
A Together with several other people from my firm, Ernst and Whinney and several management people at Cotton Brothers. I say several, I think it was just Mr. Raybourn. We met with Mr. Mike Driscoll of the Madison Driscoll firm

sult—STONEWALL. Conversation, pleasantries, but—STONEWALL.

Receiving no advice or direction from the IRI team, the Cotton team was forced to proceed, relying solely on its auditing expertise and the IRI policy. The Cotton auditors were intimately familiar with the Cotton bakery operation and they knew that the business was a single bakery business owned and operated by Cotton Bros., Inc. They also became aware that the books and records of the Alexandria subsidiary could not serve as a basis for interruption of business claims as described in the October 1, 1980 policy. Faced with a policy offering only the books and records of the Alexandria bakery subsidiary as a basis for a reduction of gross earnings loss, how could they possibly draft a methodology or a proof of loss as described in Schedule IA and IIA of the policy? However, had Cotton Bros., Inc. been included as a named insured, it is probable that the Cotton team could have drafted an appropriate methodology under which interruption of business claims by Cotton Bros., Inc. could be determined. The policy, as written and without including Cotton Bros., Inc. as a named insured, rendered this probability an impossibility. Receiving no advice or instruction from IRI or the IRI team, the Cotton team began its labors to draft a methodology containing no items relating to reduction of gross earnings. In fact, earnings, the very risk being insured, is not even mentioned—only "line items"

directly connected with the fire. Finally, on May 8, 1981, (here we quote the IRI brief)

"The Cotton team delivered to Driscoll the final draft of a document which they had developed entitled: "Methodology for Computing the Cost of Business Interruption". The approach had been developed by Raybourn and the Cotton team and *Driscoll felt that the approach was proper. He did not make or suggest changes in the metodology. [sic] His roll [sic] was to audit Cotton's claims submissions which would follow, in order to review and then discuss with the Cotton team any accounting problems, prior to expected meetings between Cotton and IRI. He was not asked by IRI to and did not calculate the loss."* (emphasis ours and citations to transcript omitted)

Could there be a more precise, a more deliberate strategy of concealment, of bad faith?

Although IRI chose experts eminently qualified in the field of interruption of business insurance, it deliberately instructed them to make no use of that expertise. IRI deliberately instructed its experts to remain silent and to make no corrections and give no advice on the methodology employed in the drafting of an interruption of business claim—just audit no matter how inappropriate the methodology may be. The STONEWALL strategy was in-

of Alexandria I think sometime in late March of 1981 and we viewed this methodology.
Q *With Mr. Driscoll, was it your impression or your understanding of what Mr. Driscoll's feelings were?*
A *Well, before any work was done of a significant nature before investing a lot of time, we wanted to make sure that the approach that Mr. Raybourn had originally thought necessary was going to be acceptable to the insurance company. We didn't want to spend a lot of time doing something that would have to be redone so we reviewed the contents of this document with Mr. Driscoll at that point.*
Q *And what if anything did he indicate regarding this document?*
A *He indicated that a line item approach would be necessary in order to submit a claim.*
He made some suggestions about some of the things in this document as well.
Q You remember any of the specifics of that?

A Not really.
Q If, Mr. Parham, at the time you prepared this, did you expect that the methodology outlined in this document would be able to account for all of the actual losses sustained by Cotton Brothers as a result of this business interruption?
A Well, I guess early on I had hoped that such a formulation such methodology would but it became obvious fairly soon there was just no way that an approach like this could gather all the costs and all the lost revenue that the company was experiencing.
Q First you thought it could and later you decided it could not?
A Yes, sir, due to my lack of prior business interruption experience at that point I thought maybe we could capture all the information we needed but it was impossible once we got into it in more detail. (emphasis ours)

structed by IRI and examination of the methodology and the proofs of loss submitted by the Cotton team disclosed no items which fit Driscoll's definition of an interruption of business claim. See paragraph 23, infra. Yet, when Cotton's methodology was presented to Driscoll on May 8, 1981, *"Driscoll felt that the approach was proper."* Driscoll, mindful of IRI's instructions, said nothing; made no correction or suggestion. We find that IRI's instruction, in conjunction with its failure to make Cotton Bros., Inc. a named insured, was intended to induce error by Cotton. The instruction was made for the illicit purpose of inhibiting and defeating Cotton's right to file any claim for earnings damages under Sections IA and IIA of the policy. The stonewall position of IRI was arbitrary, capricious, in bad faith and without probable cause.

23. IRI has contended and continues to contend through this entire proceeding that the only damages available to plaintiff under the policy are "line by line" or "line items" directly connected with the fire. This contention simply crystalizes in a different form IRI's determination to deny Cotton's right to earnings damages. It defies the clear and concise language of Sections IA and IIA. See paragraph 29, infra. It defies the definition supplied by IRI's own expert Driscoll, who testified:

"Well, basically when you are looking at a business interruption loss you are confined or you are more interested in the profit and loss section of a financial statement that would be your sales, your various costs of sales elements.... And what you eventually try to do is you try to project just like a company would try to project what they are going to do next year. You try to project what the company would have done for the period of interruption had there been no loss then you compare it to what they actually did do and the different number is the amount of loss."

Yet, through the device of IRI's strategy, Cotton has been induced to make claims limited to so-called line items and has been deprived of the right to make a claim under the principal risk insured by the policy.

IRI knew and knows that its Form E policy is entitled BUSINESS INTERRUPTION GROSS EARNINGS FORM. The form provides for two types of damages: 1) reduction of gross earnings during the period of interruption as described in Section IA and Section IIA of the policy and by the quote of Michael Driscoll referred to above, and 2) expenses related to reducing loss as described in Section III. If the damages recoverable under Sections IA and IIA are in law a determination of reduction of gross earnings during the period of interruption, then IRI has paid no reduction of gross earnings damages. Not one item paid under the proofs of loss can satisfy Driscoll's definition of that type of damage. When asked about Raybourn's line by line methodology for the determination of interruption of business losses, Driscoll stated:

"I don't know what the—where the term line by line came from. The method is not referred to the methodology and first preparation of the claim which was in three segments by Cotton Brothers is now regarding or referred to as line by line and that is basically is his method. I assume it must have been his terminology, certainly was not mine."

The fact that certain witnesses such as Gene Cotton and Raybourn might have testified that items in the proofs of loss were Section IA and IIA damages must be attributed to their lack of knowledge and experience and to the misguidance or lack of guidance induced by the strategy adopted in bad faith by IRI as described in paragraphs 21 and 22 above. A policy restricting damages to line item claims is an extra expense policy. We have found previously that Cotton, on the advice of IRI, rejected extra expense coverage in favor of interruption of business coverage. See paragraphs 5 and 6, supra. IRI, in absolute defiance of Sections IA and IIA, has restricted damages to those afforded by an extra expense policy. This is yet another example of IRI's arbitrary, capricious and bad faith attempt to deny, without probable cause, Cotton's right to earnings damages as provided in Sections IA and IIA.

24. The February 13, 1981 fire brought extreme financial strain on Cotton's bakery operation. Lack of sufficient cash flow and of sufficient funds to pay Baker Perkins for the replacement equipment, made replacement contingent upon IRI's payments under the fire policy. This is why it was necessary for Cotton to secure IRI's agreement to Cotton's choice of the accelerated contract for the replacement of the oven and proofer for the sum of $1,354,820.00. IRI agreed to that choice and IRI's adjuster, Jarratt, drafted and presented to Cotton a proof of loss in the amount of $1,354,820.00 as payment *under the fire policy* for the loss of the oven and the proofer. Gene Cotton signed and accepted this proof of loss on March 6th and returned it to IRI for payment. Based on IRI's commitment, and thinking that full payment was assured, Gene Cotton, on that very afternoon, called Baker Perkins by telephone and accepted the $1,354,820.000 replacement contract. Cotton was committed. IRI then refused payment. Now Cotton was compromised. Cotton had exercised extraordinary diligence in its efforts to rebuild and restore in the shortest time as possible to the evident benefit of both IRI and itself. It had been successful in securing the contractor most capable of doing a competent job in the shortest time possible. It had settled its claim against IRI for the loss of the proofer and the oven for a sum proposed by IRI's own agent. IRI now refused to pay. Incredible!

Cotton vigorously protested that the proof of loss presented by Jarratt on behalf of IRI became an enforceable contract settling the claim when accepted on March 6, 1981 by Gene Cotton. But IRI, possessor of the money, was prosecutor, judge and jury. Cotton had no means of enforcing its enforceable contract. It could not sue. Time was of the essence. As IRI well knew the destruction of the oven and proofer was a loss insured under the fire policy, not the interruption of business policy, and Jarratt's proposal, as it should, agreed to pay Cotton the exact cost (agreed to by IRI) of replacing that equipment. From

his previous conversations and negotiations with IRI, Cotton was well aware of the conditions under which IRI would agree to restore the payment originally proposed by Jarratt. Cotton was forced to accept payment of $1,030,085.00, $324,735.00 less than originally offered by Jarratt (IRI), for the loss under the fire policy. This is the cost suggested by Baker Perkins under its repair proposal, which was the lowest of the three proposals submitted by Baker Perkins and, as we have previously found, was not a firm proposal or a viable alternative.

IRI had a vital interest in the accelerated contract. That contract advanced the termination of the period of interruption from June 1, 1982 to September 21, 1981. IRI suggests that, at the gratuitous request of Cotton's attorney, Alexius, it had gratiously advanced $324,735.00 as expediting expense to be repaid to IRI if Baker Perkins failed to perform the accelerated contract timely. IRI calls it Cotton's gamble. We find that IRI advanced nothing. Viewed with its contemporaneous refusal to pay the full amount of the March 6, 1981 proof of loss, we call it a strong-arm attempt by IRI to shift to Cotton the entire risk of Baker Perkins possible failure to perform.

The first paragraph of the proposal letter of Alexius referred to by IRI is as follows: [7]

"Pursuant to our several conversations, Cotton Bros. Baking Company, Inc., is willing to propose a solution to the adjustment problems which have arisen since IRI rejected the proofs of loss prepared by GAB and submitted by Mr. Cotton on March 6, 1981. *You are advised, however, that our proposition is made in a spirit of compromise only, and is not to be considered a derrogation [sic] from our prior position that an enforceable contract of settlement matured when Mr. Cotton accepted your March 6, 1981, proposal.*" (emphasis ours)

We find that IRI's actions as set forth above were deliberate, arbitrary, capri-

---

**7.** Exhibit P–137, IRI's Exhibit No. 1.17.2.

cious, in absolute bad faith and without probable cause.

25. In a slightly similar situation the Cotton team had claimed on its September, 1981 proof of loss the sum of $182,655.00, as cost of the cascade, a piece of equipment used to in-load the proofer. IRI paid that item. Later IRI, characterizing this piece of equipment as "expediting expense", reduced their later payment to Cotton by this amount. Although the purchase of this equipment expedited nothing, we find that Cotton had agreed to pay for that item and to its characterization as "expediting expense" as a vehicle to repay IRI. IRI was entitled to reimburse itself for the $182,655.00 that it had paid by this arrangement with Cotton.

26. In Civil Action No. 83–3237, entitled Baker Perkins, Inc. v. Cotton Bros., Inc., the latter cross-claimed for damages including loss of gross earnings damages and received a jury award of $1,342,624.00. The entire jury award consisted of loss of gross earnings suffered by Cotton Bros. Inc. from the projected date of completion of Baker Perkins' accelerated contract, September 21, 1981, to May 8, 1982.

### CONCLUSIONS OF LAW

27. As we have shown previously, it has been the intention of Cotton and IRI since 1970 to give the Cotton bakery operation full insurance protection and coverage against the risk of loss or reduction of gross earnings as defined in the policy during any period of interruption of business as defined in the policy. This is what the parties intended and this is what the policy was designed to accomplish.

The Cotton bakery operation in 1970 consisted of four separate corporations, each of which owned and operated their separate bakery businesses just as they had done prior to the acquisition by the Cottons. There was no interdependency among them. They operated in competition with each other. Thus, although they were owned by Cotton, they were separate and independent bakery businesses and it followed from this that the books and records of each would reflect accurately the increase or decrease in gross earnings for specific periods of time. Cotton's bakery operation was effectively insured by making the individual bakery corporations named insureds and this coverage continued to be effective as long as the bakery business of each of these companies continued to be operated independently, separately and in competition with each other.

However after the reorganization of 1976, there was but one Cotton bakery business and that one business was owned, controlled and operated on a day to day basis by Cotton Brothers, Inc. Thus Cotton Brothers, Inc. was the sole indispensable named insured in any policy designed to give interruption of business coverage to the Cotton bakery business.

■ Under Louisiana law, an insurance policy may be reformed after proof that it does not express the actual contract intended by the parties due to mutual error or mistake. *Kolmaister v. Connecticut General Life Insurance Co.*, 370 So.2d 630 (La.App. 4th Cir.1979), writ denied, 373 So.2d 531 (La.1979). *See Phillips Oil Co. v. OKC Corp.*, 812 F.2d 265 (5th Cir.1987). Where, as here, the mutual mistake concerns identity of the named insured and destroys coverage on the risk actually assumed by the insurer, the insurer is estopped to deny its liability even in the absence of reformation and estopped from opposing reformation of its policy to cover such risks incurred by the party at interest. *Bonadona v. Guccione*, 362 So.2d 740 (La. 1978); *Fontenot v. American Fidelity Fire Ins. Co.*, 386 So.2d 165 (La.App. 3d Cir.1980).

■ It is our conclusion that, through the mutual mistake of Cotton and IRI, Cotton Bros., Inc. was not included as a named insured in the policy issued in 1976; that the renewal of that policy on October 1, 1980 perpetuated the error; that neither Cotton nor IRI intended in 1976 or 1980 to reduce the full interruption of business coverage afforded previously by the four separate interruption of business policies and that the policy issued October 1, 1980 should be reformed so as to include Cotton

Bros., Inc. as a named insured effective October 1, 1980.

28. We have found that Cotton exercised due diligence and dispatch to rebuild, repair or replace, at the earliest date possible, as required by the policy, the property and equipment destroyed in the fire of February 13, 1981 and that production equal to the February 13, 1981 production was achieved on May 8, 1982. We conclude therefore that the period of interruption extended from February 13, 1981 to May 8, 1982, inclusive.

29. IRI drafted its October 1, 1980 renewal policy on an IRI Form E entitled "BUSINESS INTERRUPTION *GROSS EARNINGS FORM* FOR MANUFACTURING OR MERCANTILE OPERATIONS" (emphasis ours). The policy provides for two types of damages: 1) reduction of gross earnings as provided in Sections IA and IIA, and 2) expenses related to reducing loss as provided in Section IIIA. We shall not discuss the latter type because there is no dispute regarding IRI's payment of Section III claims. Reduction of gross earnings are described in the policy as follows:

### SECTION I

A. Recovery in the event of loss hereunder shall be the ACTUAL LOSS SUSTAINED by the Insured resulting directly from such interruption of business, but not exceeding the reduction in gross earnings less charges and expenses which do not necessarily continue during the interruption of business, for only such length of time as would be required with the exercise of due diligence and dispatch to rebuild, repair or replace such described property as has been damaged or destroyed, commencing with the date of such damage or destruction and not limited by the date of expiration of this Policy. Due consideration shall be given to the continuation of normal charges and expenses, including payroll expense, to the extent necessary to resume operations of the Insured with the same quality of service which existed immediately preceding the loss.

### SECTION II

A. GROSS EARNINGS—For the purpose of this insurance "gross earnings" are defined as the sum of:

1. total net sales value of production (manufacturing operations),
2. total net sales of merchandise (mercantile operations), and
3. other earnings derived from operations of the business, less the cost of:
4. raw stock from which such production is derived,
5. supplies consisting of materials consumed directly in the conversion of such raw stock into finished stock or in supplying the service(s) sold by the Insured,
6. merchandise sold, including packaging materials therefor, and
7. service(s) from outsiders (not employees of the Insured) for resale which do not continue under contract.

No other costs shall be deducted in determining gross earnings. *In determining gross earnings due consideration shall be given to the experience of the business before the date of damage or destruction and the probable experience thereafter had no loss occurred.* (emphasis ours)

The purpose of the damages provided in Sections I and II above are described by Driscoll, as we have previously quoted: "you try to project what the company would have done for the period of interruption had there been no loss then you compare it to what they actually did do and the different number is the amount of loss." The policy language above "sets forth the formula for calculating the amount actually lost by an insured when business is interrupted, and allows the business to remain in the same financial condition as before the loss." *United Land Investors, Inc. v. Northern Insurance Co. of America,* 476 So.2d 432 (La.App.2d Cir.1985). *See also Cora Pub, Inc. v. Continental Casualty Co.,* 619 F.2d 482 (5th Cir.1980).

The formula for calculating the insured's loss is in terms of reduction of gross earnings, as quoted verbatim above from the policy, and is "unambiguous and consti-tute[s] the law between the contracting parties." *United Land Investors, supra* at 436 (citing *Rogers v. American Ins. Co.,* 338 F.2d 240 (8th Cir.1964); *Associated Photographers v. Aetna Casualty and Surety Co.,* 677 F.2d 1251 (8th Cir.1982); *Eastern Associated Coal Corp. v. Aetna Casualty and Surety Co.,* 632 F.2d 1068 (3d Cir.1980)).

■ A 'projection' of earnings is an accepted method of calculating business interruption loss. *See Associated Photographers, supra.* Indeed, the policy language approves, if not requires, the use of 'projected' earnings:

> In determining gross earnings due consideration *shall* be given to the experience of the business before the date of damage or destruction *and* the *probable* experience thereafter had no loss occurred. (emphasis ours)

Accordingly, we hold that the projections presented by plaintiff of its business interruption losses conform to the terms of the policy.

Cotton has submitted for our consideration three projections as a basis for its claim of reduction of gross earnings damages.

■ Lost earnings need only be proved to a reasonable certainty. *See Borden, Inc. v. Howard Trucking Co.,* 454 So.2d 1081 (La.1983). The law does not require mathematical precision or absolute exactness in determining the amount of lost earnings: "the trier of fact must be afforded much discretion in the determination of such damages where the evidence clearly shows that damage is proven but not capable of proof to a mathematical or legal certainty." *Rosenblath v. Louisiana Bank & Trust Co.,* 432 So.2d 285, 290 (La.App.2d Cir.1983). *See Palmer v. Connecticut Railway & Lighting Co.,* 311 U.S. 544, 561, 61 S.Ct. 379, 385, 85 L.Ed. 336, 343 (1941) ("Certainty as to the amount goes no further than to require a basis for a reasoned conclusion.") Accordingly,

where it is not possible to state or prove a perfect measure of lost earnings, "courts have reasonable discretion to assess damages based upon all the facts and circumstances of the case." *Tide Craft, Inc. v. Red Ball Oxygen Co.,* 514 So.2d 664 (La. App.2d Cir.1987), writ denied, 516 So.2d 135–36 (La.1987). *See Roshong v. Travelers Ins. Co.,* 281 So.2d 785, 789 (La.App. 3d Cir.1973).

Among the three projections presented by Cotton at the trial, labelled the "yellow", "blue", and "gray" projections, we consider the blue projection of $4,498,-000.00 in lost income for the period February 14, 1981 through May 8, 1982, as the best calculation of damages.

Our reasons for choosing the blue projection are straightforward.

■ The "blue" projection was prepared by Parham of Ernst & Whinney using the "least squares method" to forecast earnings through the interruption period. Parham used the audited financial statements of the parent Cotton Bros., Inc. for the years 1976 through 1980, less non-recurring expenses, and with "historical data points", calculated a "regression analysis projection". The projected earnings were then subtracted from the actual earnings. The blue projection corresponds exactly to the method set forth in the policy and attested to by Driscoll (par. 23, supra).

The "gray" projection, also prepared by Parham, freezes Cotton's 1980 earnings and simply projects the 1980 earnings without assuming any increase (or decrease). On the other hand, the blue projection is based precisely on the years (1976–1980) before the fire when Cotton operated as a single bakery operation following its reorganization.

The "yellow" projection, although prepared before the fire, was prepared by Cotton management, not by an independent CPA or auditor. Further, this 'internal' projection is based only on the years 1978–1980 and uses, instead of actual income, a formula of "converting pounds produced to sales". Also, because Cotton prepared the yellow projection to support an application

for a large bank loan, it is, more probably than not, too optimistic.

IRI objects to the use of Cotton's projections, citing *Wilkins v. University of Houston*, 654 F.2d 388 (5th Cir.1981), *on petition for rehearing*, 662 F.2d 1156 (5th Cir.1981). *Wilkins* warns that statistical evidence "must be employed with great care" even if such evidence is the "best, if not the only, means" of proof available. *Wilkins, supra* at 403. In particular, IRI complains that Cotton's projections fail to account for Cotton's loss of a major contract with Winn–Dixie, for a labor strike and for the effects of a recession. *Cf. Wilkins, supra* at 402. However, these events occurred after the period of business interruption ended, May 8, 1982.

We conclude therefore that Cotton is entitled to $4,498,000.00 as damages under Sections IA and IIA of the policy, with interest as set forth in paragraph 33, infra.

30. IRI made the following payments under the policy:

| PAYMENT DATE | AMOUNT |
|---|---|
| 3–23–81 | $ 162,367.50 |
| 9–15–81 | $1,425,289.35 |
| 1–29–82 | $ 912,250.32 |
| 12–22–82 | $1,053,276.00 |
| 4–4–83 | $ 32,578.80 |
| | $3,585,761.97 |

■ The issue of what part of these payments if any should be considered earnings damages under Sections IA and IIA has not been addressed by the parties. Obviously, since only reduction of earnings damages are in contest, only reduction of earnings damages paid by IRI should be credited against IRI's reduction of earnings liability. We cannot determine from the record what proofs of loss were paid or rejected by IRI or the grounds upon which such actions were taken. Nor can we determine which categories of claimed losses

properly belong under Section III and which have been allocated to Sections IA and IIA.[8] We do know that all the claimed losses were so-called "line items" so that none were reduction of earnings as defined by Driscoll or by Sections IA and IIA. This compels the conclusion that IRI is entitled to no credit whatsoever for payment of earnings damages. This conclusion, though eminently rational, offends equity. It is certainly possible that IRI paid certain cost items which do not fit the definitions of Sections IA and IIA or Section III but which in some way involved or affected earnings. IRI itself has stated, without explanation, that it paid $427,-460.67 in earnings damages and $3,158,-302.10 [sic] in "extra expenses". As we have declared previously, we cannot verify the accuracy of this allocation. We do know that IRI paid $3,585,761.97 in total damages, and that they state that $3,158,-302.10 of that amount was Section III damages. The remaining $427,460.67 in cost items cannot be classified legally as earnings damages as defined by the policy. Nevertheless the $427,460.67 was accepted by Cotton and we hold in equity that IRI should receive credit. However, because this credited amount was part of IRI's scheme to restrict Cotton's recovery to line item damages and to deny Cotton any Section IA and IIA damages, IRI's credit shall not be applied until Cotton's total damages plus penalties, interest and attorney's fees has been adjudged.

We recognize that the $182,655.00 (cost of cascade) was rightfully withheld by IRI. That item was withheld with the assent of Cotton as repayment for the cost of the cascade.

■ 31. We have held that IRI is not entitled to the $324,735.00 so-called "expediting expense" because that money be-

---

**8.** We find that the record, though vast, is not sufficient in detail for us to determine the basis on which items of the proofs of loss were paid or rejected by IRI. We have determined however that there are no items related to reduction of gross earnings as described in Sections IA and IIA so that none of the cost items recognized and paid by IRI fit the description in the policy on the definition of its expert, Driscoll.

Therefore, as a matter of right, IRI is not entitled to credit for the payment of any IA and IIA damages whatever. However, in its trial memorandum filed September 30, 1986 (page 3) IRI declares that $427,460.67 of the funds paid by it to Cotton represent payment for claims for reduction of gross earnings less non-continuing charges and expenses.

longed to Cotton under the fire policy proof of loss drafted and presented by IRI's Jarratt to Cotton and accepted by Gene Cotton on March 6, 1981. See par. 24, supra. That acceptance made IRI absolutely and unconditionally liable for $1,354,820.00 as payment under the fire policy for the loss of the oven and the proofer. Under La. R.S. 22:658, IRI was absolutely and unconditionally obliged to pay the full amount of that accepted proof of loss on or before sixty days from March 6, 1981.

We hold IRI's refusal to pay the full amount of the March 6, 1981 proof of loss drafted and presented by IRI and accepted by Cotton was arbitrary, capricious, in bad faith and without just cause and that Cotton should have judgment against IRI in the amount of $324,735.00 with penalties and attorney's fees under La.R.S. 22:658 and interest.[9]

■ 32. In Civil Action No. 83–3237, entitled Baker Perkins, Inc. versus Cotton Bros., Inc., the latter cross-claimed for damages, including loss of gross earnings damages, and received a jury award of $1,342,624.00 for loss of gross earnings. Louisiana law is well-settled that an insurer is entitled to be subrogated to the rights of its insured after payment of the latter's claim. La.C.C. art. 1829; *Aetna Insurance Co. v. Naguin*, 488 So.2d 950 (La. 1986); *Joe E. Freund, Inc. v. Insurance Company of North America*, 261 F.Supp. 131 (W.D.La.1966).

■ IRI is not entitled to subrogation so long as the IRI policy does not name Cotton Bros., Inc. as a named insured. Since we have reformed the policy to make Cotton Bros., Inc. a named insured, and since the entire jury award consisted of earnings damages suffered by Cotton Bros., Inc., IRI is entitled to subrogation and is entitled to credit against the principal award, penalties, attorney's fees and prejudgment interest in favor of Cotton Bros., Inc. in this proceeding[10].

However, IRI is not entitled to subrogation until it has paid to Cotton Bros., Inc. the entire amount of the judgment rendered in this Opinion. Upon such payment by IRI, the jury verdict and judgment for Cotton Bros., Inc. in Civil Action No. 83–3237 shall become the property of IRI. Cotton Bros., Inc. shall make a written legal assignment to IRI upon IRI's request. IRI shall assume the costs (and risks) of collecting the judgment rendered in Civil Action No. 83–3237.

33. Louisiana law governs the award of prejudgment interest, and 28 U.S.C. § 1961 governs the award of postjudgment interest in this case. *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.*, 848 F.2d 613 (5th Cir.1988).

■ Under Louisiana law, legal interest is due "at least from date of judicial demand on a claim for damages arising out of breach of contract, regardless of whether the precise amount of the claim is unliquidated, disputed or not ascertainable with certainty at the time suit is filed." *Mini Togs Products, Inc. v. Wallace*, 513 So.2d 867 (La.App.2d Cir.1987), writs denied, 515 So.2d 447 (La.1987). *See also, Smith v. State Farm Fire and Casualty Co.*, 695 F.2d 202 (5th Cir.1983) (interest on penalty

---

**9.** We have jurisdiction here. Cotton has specifically contested IRI's reduction of the $1,354,-820.00 due Cotton for the fire loss of the oven and proofer on the ground that the mutually executed proof of loss was an enforceable contract settling that claim (see La.R.S. 22:658), reserving all of its rights. We simply have acted on the rights so reserved.

**10.** Plaintiff has cited *Ford Motor Credit Co. v. State Farm Mutual Automobile Insurance Co.*, 309 So.2d 914 (La.App.3d Cir.1975) and *Powers v. Calvert Fire Insurance Co.*, 216 S.C. 309, 57 S.E.2d 638 (1950) as authority for the contention that subrogation in this proceeding is an equitable doctrine and should not be available to IRI because IRI joined with Baker Perkins, Inc. in contesting the claim of Cotton Bros., Inc. to loss of earnings damages. We hold that those authorities are not pertinent here. IRI has a perfect right to contest plaintiff's claims to such damages as part of its own defense in this proceeding and the equitable doctrine ennunciated in plaintiff's authorities cannot be interpreted to deprive IRI of that right.

It is possible, despite the American rule, that IRI's subrogation should be reduced by reasonable attorney's fees expended by Cotton in its suit against Baker Perkins. Because of the attorney's fees awarded under LSA–R.S. 22:658, we refuse to do so. See para. 1027, infra.

and fee awards under LSA–R.S. 22:658 also commences from date of judicial demand).

Accordingly, plaintiffs shall receive legal interest from the date suit was filed in accordance with La.C.C. art. 2924, and from date of judgment in accordance with 28 U.S.C. § 1961 on the entire amount of the judgment rendered in this Opinion.

34. LSA–R.S. 22:658 provides that insurers who arbitrarily, capriciously, or without probable cause fail to pay any claim within sixty days of proof of loss[11] are liable for the amount of the loss as well as a penalty of 12% of "the total amount of the loss" and all reasonable attorney's fees "for the prosecution and collection of such loss." If the insurer has made a "partial payment", the penalty is 12% of the difference between the amount tendered and the amount actually owed. LSA–R.S. 22:658. *See Fuqua v. Aetna Casualty & Surety Co.*, 542 So.2d 1129 (La.App. 3d Cir.1989).

■■■ Whether an insurer's failure or refusal to pay is arbitrary, capricious or without probable cause within the meaning of the statute is a question of fact to be determined in light of the facts and circumstances of the particular case. *Smith v. State Farm Fire and Casualty Co.*, 695 F.2d 202, 205 (5th Cir.1983) (citations omitted). In particular, it is a determination that "depends primarily on the facts known to the insurer at the time of its actions." *Scott v. Insurance Co. of America*, 485 So.2d 50, 52 (La.1986). "The words arbitrary and capricious … do not necessarily imply an opprobrious connotation." *Steadman v. Pearl Assurance Co.*, 167 So.2d 527, 531 (La.App. 4th Cir.1964). Rather, arbitrary conduct merely "implies an abuse of one's authority or power." *Id.* Further, the fact that an insurer mis-reads or misinterprets the clear and unambiguous provisions of its own policy does not relieve the insurer of liability under LSA–R.S. 22:658. *Fidelity & Casualty Co. of N.Y. v. Superior Casing Crews, Inc.*, 642 F.2d 147, 150 (5th Cir.1981). The insurer, not the insured, takes the risk of misinterpreting its

own policy provisions. *Marks v. Trinity Universal Insurance Co.*, 531 So.2d 516 (La.App.2d Cir.1988). Insurers are "charged with knowledge of their policy's contents." *Carney v. American Fire & Indemnity Co.*, 371 So.2d 815 (La.1979). Accordingly, an insurer may be deemed arbitrary and capricious for failing to properly assess and pay damages which fully compensate the insured, where the policy requires that the insured be fully compensated. *Higginbotham v. New Hampshire Indemnity Co.*, 498 So.2d 1149 (La.App. 3d Cir.1986).

■■■ The facts of this case are distinctive. The stonewall position undertaken by IRI, which conduct we find was arbitrary, capricious, in absolute bad faith and without probable cause, precluded Cotton from submitting a proof of loss that would have compensated Cotton as provided for by IRI's policy. To this very day, IRI resists any claims calculated according to Sections IA and IIA of its policy. This conduct is an absolute abuse of IRI's 'power' and position as ultimate arbiter of what losses are properly payable under its policy provisions. IRI's conduct goes beyond mere breach of contract. It offends acceptable notions of business ethics.

IRI's refusal to assist Cotton in calculating claims properly payable to Cotton under the policy constitutes precisely the conduct which Louisiana law proscribes. An insurer must timely pay what is due the insured. IRI has never even deigned to consider what is properly due Cotton and certainly there can be no doubt that IRI knew that Cotton was entitled to interruption of business (earnings) damages.

■■■ Accordingly, IRI is liable for the statutory penalty of 12% on the $4,498,-000.00 in earnings not paid under IRI's business interruption policy and $324,-735.00 not paid under IRI's property damage (fire) policy and for the attorney's

---

**11.** A 'satisfactory proof of loss' for purposes of LSA–R.S. 22:658 is that which provides the insurer with sufficient facts to apprise the insurer of the insured's claim or to acquire knowledge of the insured's loss. *See Hart v. Allstate Insurance Co.*, 437 So.2d 823 (La.1983).

fees[12] incurred by Cotton in prosecuting its claim against IRI, with interest on the whole as set forth in paragraph 33.

## CONCLUSION

35. IRI issued an interruption of business policy in favor of the three (really all five) subsidiary bakeries as named insureds and intended to cover the Cotton bakery business. All parties admit that the fire of February 13, 1981 was an occurrence in the contemplation of the policy and that it took place on the property of a named insured, the Alexandria subsidiary. Indeed IRI has paid substantial Section IIIA damages under the policy. The primary purpose of the policy was to protect Cotton's income, i.e. the possible reduction of gross earnings which might be suffered by the Cotton bakery business during the period required to restore production as it existed on the date of the fire (interruption of business damages under the provisions of Sections IA and IIA). As we have seen, not one item of damage paid by IRI fits the definition of interruption of business (reduction of earnings) damages as defined by its own expert or by its policy. IRI has not paid one cent in earnings damages. It follows that if the fire had occurred at the Shreveport, Monroe, Natchez or Baton Rouge plant, under IRI's interpretation of the policy and under its strategy, it would have been liable for the same amount of interruption of business damages—none. Following IRI's interpretation and strategy to its logical conclusion, IRI, under its $39,-000,000.00 interruption of business policy was obliged to pay no interruption of business damages. The interruption of business risk was solely the risk of Cotton Bros., Inc. IRI cannot be allowed to avoid all business interruption (earnings) damages, simply because of its own failure to include Cotton Bros., Inc. as a named insured in the policy. We have determined that IRI's contentions are not persuasive.

We conclude therefore, that as a matter of law:

That the interruption of business insurance policy number 31815935 issued October 1, 1980 by Industrial Risk Insurers in favor of Cotton Brothers Baking Company, Inc., et al should be reformed so as to make and include Cotton Bros., Inc. as a named insured effective October 1, 1980; that

There should be judgment in favor of Cotton Brothers Baking Company, Inc. and Cotton Brothers, Inc. and against Industrial Risk Insurers in the amount of $324,-735.00 plus penalties and attorney's fees under LSA–R.S. 22:658 with pre-judgment interest from January 12, 1983 in accordance with Louisiana Civil Code article 2924 and post-judgment interest thereon in accordance with 28 U.S.C. § 1961; that

There should be judgment herein in favor of Cotton Brothers, Inc. and against Industrial Risk Insurers in the amount of $4,498,000.00 plus penalties and reasonable attorney's fees under LSA–R.S. 22:658 with pre-judgment interest thereon from January 12, 1983 in accordance with Louisiana Civil Code article 2924 and post-judgment interest in accordance with 28 U.S.C. § 1961, less a credit against this total amount allowed and decreed in equity in favor of Industrial Risk Insurers in the amount of $427,460.67;

That, upon payment by Industrial Risk Insurers to Cotton Bros., Inc. of the entire amount (less credit) awarded in the preced-

---

12. The decision on the merits is a "final decision" for purposes of appeal as a matter of law under 28 U.S.C. § 1291 even though the amount of attorney's fees for the litigation remains to be determined. *Budinich v. Becton Dickinson and Co.,* 486 U.S. 196, 108 S.Ct. 1717, 100 L.Ed.2d 178 (1988).

The parties may stipulate by compromise the amount of attorney's fees. If they have not done so prior to September 10, 1989, Cotton Brothers Baking Company, Inc. and Cotton Bros., Inc. shall file on or before October 10, 1989 a motion to set attorney's fees, including fees for the filing and submission of this motion and also projected or suggested fees for answering and trial of appeal if any. Plaintiffs should file with their said motion all bills submitted and paid and all supporting documentary evidence along with appropriate authorities and suggested findings of fact and conclusions of law. Local Rule 20.16 of the Western District of Louisiana. IRI may file opposition on or before November 10, 1989 accompanied by any supporting documentary evidence, authorities and suggested findings of fact and conclusions of law.

ing paragraph, Industrial Risk Insurers shall be subrogated to all rights, title and interest of Cotton Bros., Inc. in and to Civil Action No. 83–3237 of the United States District Court for the Western District of Louisiana entitled Baker Perkins, Inc. versus Cotton Brothers, Inc. and in accordance with said subrogation and upon request of Industrial Risk Insurers, Cotton Bros., Inc. should execute in favor of Industrial Risk Insurers a valid, legal and written assignment of all its rights, title and interest in Civil Action No. 83–3237 described above.

DONE AND SIGNED.